UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard A. GARDNER,
Defendant–Appellant.

No. 87–2170.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1988.

Decided Oct. 26, 1988.

Michael F. McMorrow, Milwaukee, Wis., for defendant-appellant.

James L. Santelle, Asst. U.S. Atty., Patricia J. Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD, Jr., and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This is a direct criminal appeal of the defendant's two-count conviction for violating 47 U.S.C. § 553 [1] by willfully and knowingly assisting in the unauthorized interception and reception of cable service. A jury convicted the defendant-appellant, Richard A. Gardner, for selling seven cable converter boxes, which are capable of receiving unauthorized cable service, to an informant for the Federal Bureau of Investigation ("FBI"). We affirm the conviction.

## I

In the indictment, Gardner was charged with two separate incidents of selling cable converter boxes ("black boxes") to G. William Perrin. In the late summer of 1985, Perrin noticed Gardner's advertisement for the black boxes on a computer bulletin board service in Milwaukee, Wisconsin. In his advertisement, Gardner claimed that the black boxes enabled users to intercept premium cable television programming after paying only the minimum monthly subscription rate. After reading the ad, Perrin contacted the executives at the Warner Cable Company, which supplied the cable television service to the area, the Milwaukee Police Department and the FBI to determine the legality of the black boxes.

In cooperation with the FBI, Perrin initiated contact with Gardner to purchase some of the black boxes. The FBI, with the consent of Perrin, recorded the series of telephone and computer board service communications between Perrin and Gardner. On October 7, 1985, Perrin used money provided by the FBI to purchase two black boxes with corresponding remote control units from Gardner. The purchase totaled $450. At the time of this first transaction, Gardner showed Perrin the manner in which the boxes intercepted the premium cable programming. Gardner

also gave Perrin a "Notice of Warning," which limited the liability of Gardner's company for illegal use. On December 15, 1985, Perrin purchased another five boxes from Gardner for $1000, and later ceded these boxes to law enforcement officers.

On December 18, 1985, three days after the last purchase by Perrin, federal agents conducted a search of Gardner's residence pursuant to a search warrant. During the search, the agents discovered fifty pieces of highly technical recording and playback equipment. They also found sixteen additional black boxes in various states of repair, and an account book with at least twenty receipts which showed payments made to unidentified purchasers.

During the Government's case-in-chief, the prosecution provided evidence that Gardner had sold the black boxes to other purchasers. The Government introduced testimony by three other individuals who had purchased Gardner's boxes. Phillip A. LaPorte testified that he had a retail agreement with Gardner, whereby he purchased the boxes and resold them for a profit. Patrick G. Babler and Robert A. Bruss also testified that they purchased one box each from Gardner. The prosecution presented evidence that Gardner sold a total of twenty-three black boxes in the late summer and early fall of 1985.

In the indictment against him, Gardner was charged with two counts of violating 47 U.S.C. § 553 for selling the cable converter boxes to Perrin on October 7 and December 15, 1985. The indictment charges Gardner with willfully and knowingly assisting in the unlawful interception and reception of cable services for his personal, pecuniary gain by modifying and distributing for sale equipment that he intended to be used for unauthorized reception of cable services. The jury found Gardner guilty on both counts. The federal magis-

1. Section 553(a) provides:
   (1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or ... by law.
   (2) For the purposes of this section, the term "assist in intercepting or receiving" shall in-

clude the manufacture or distribution of equipment intended by the manufacturer or distributor ... for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).
47 U.S.C. § 553(a).

trate, who tried the case by consent of the parties, sentenced Gardner to forty-five days under a work-release program on Count I. The imposition of sentence on Count II was suspended, and Gardner was placed on two-years probation to follow the work-release program. Gardner was also directed to pay $450 in restitution, and a special $50 fine to the United States Attorney's Office.

On appeal, Gardner challenges his conviction on five grounds. First, Gardner contends that 47 U.S.C. § 553 is unconstitutionally overbroad and vague. Second, he contends that the indictment is fatally defective because the Government withheld from the indicting grand jury exculpatory evidence which allegedly negates his guilt. Third, he claims that the Government failed to establish the requisite "specific intent," and that the trial court failed to instruct the jury that "specific intent" must be found. Fourth, Gardner alleges that the Government failed to establish, and the trial court failed to instruct, that the sole and specific purpose of Gardner's black box was the unlawful interception of cable programming, and that Perrin actually used the boxes. Finally, Gardner claims that the trial court abused its discretion by considering a prior conviction which had been set aside under the Federal Youth Corrections Act.

## II

■ Gardner challenges 47 U.S.C. § 553 as unconstitutionally unclear, overbroad and vague. He argues that because the black boxes have both legal and illegal applications, § 553 provides inadequate notice that sales of such boxes are illegal. We reject such a contention.

Statutes are adjudged to be vague if they provide insufficient notice to potential offenders and no guidance for enforcement. *See Levas & Levas v. Village of Antioch*, 684 F.2d 446, 452 (7th Cir.1982). However, this court has determined that "[t]he practical effect of the vagueness doctrine is not to make statutes readable by the laity but to limit the discretion of police and prosecu-

tors." *Waldron v. McAtee*, 723 F.2d 1348, 1354 (7th Cir.1983).

The statute before us does not offend any of the concerns underscored by the vagueness doctrine. It unambiguously prohibits any person from intercepting, receiving, or assisting in the interception or reception of cable service, unless authorized by a cable operator or by law. 47 U.S.C. § 553(a)(1). Furthermore, the statute specifically defines the term "assist," *see id.* § 553(a)(2), for which Gardner was indicted and convicted.

Although the black boxes may have both legal and illegal applications, this factor does not make the statute vague. In defining the term "assist," the statute clearly states that it includes "the manufacture or distribution of equipment *intended* by the manufacturer or distributor" for unlawful reception of cable service. *Id.* (emphasis added). This prohibited activity is precisely that for which Gardner was convicted. Moreover, the intent requirement mitigates any vagueness concern. *See Record Head Corp. v. Sachen*, 682 F.2d 672, 674 (7th Cir.1982). Gardner could not have been convicted if he sold the black boxes with the intent that they would be used for lawful purposes. The statute both puts potential defendants on notice that selling cable converter boxes with the intent that they would be used unlawfully is illegal and gives guidance to law enforcement as to what conduct is proscribed. Thus, we reject Gardner's contention that § 553 is vague and too broad.

## III

■ Gardner challenges the indictment, contending that he suffered undue prejudice because the Government failed to present certain exculpatory evidence to the grand jury. Gardner argues that the Government should have informed the jury that he admitted to potential purchasers that the application of § 553 to the sale was uncertain, and that he had given Perrin a "Notice of Warning," which transferred the responsibility for illegal use of the black box to the purchaser.

The grand jury determines whether probable cause exists that a crime has been committed, and it protects citizens against unfounded criminal prosecutions. *See United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2658–59, 33 L.Ed.2d 626 (1972). To pursue this function, the grand jury has traditionally been accorded wide latitude in considering the evidence presented before it. *See Calandra,* 414 U.S. at 343, 94 S.Ct. at 617. A grand jury proceeding, however, "is *not* an adversary hearing in which the guilt or innocence of the accused is adjudicated." *Id.,* 94 S.Ct. at 618. Thus, the Government is not required to submit exculpatory evidence to a grand jury. *United States v. Wilson,* 798 F.2d 509, 517 (1st Cir.1986); *United States v. Hawkins,* 765 F.2d 1482, 1488 (11th Cir. 1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986); *United States v. McClintock,* 748 F.2d 1278, 1285 n. 3 (9th Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985).

Moreover, while Gardner asserts that the "Notice of Warning" and other evidence that allegedly limited his liability for the purchasers' illegal use of the "black boxes" served to negate his guilt, the trial court concluded that this evidence merely served as an affirmative defense. *Decision and Order* at 2 (May 6, 1987) (pertaining to Gardner's pre-trial motions). As the magistrate concluded, the "Notice of Warning" and other relevant evidence were pertinent to Gardner's willfulness. The evidence does not negate Gardner's alleged guilt. This situation is not analogous to *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), in which the Government presented false evidence to the grand jury. Instead, this is a situation in which the Government simply refused to present *all* of the appellant's available defenses. In such a context, we conclude that the indictment was not defective. In our judicial system, the appellant is entitled to one criminal trial, not two.

## IV

In the trial court, Gardner filed a post-conviction motion for a new trial because the magistrate refused to submit his proposed instruction, which stated that specific intent was required for conviction. On appeal, Gardner again challenges the trial court's failure to tender this instruction. He further claims that the evidence did not show his specific intent and was thus insufficient to support the jury verdict.

■ While the trial court agreed that a conviction under § 553 requires more than general intent, it also concluded that simply using the phrase "specific intent" ineffectively instructs the jury. As the trial court stated: "To simply use the phrase 'specific intent' itself conveys no special meaning to the jury." *Decision and Order* at 4 (July 7, 1987) (pertaining to Gardner's post-trial motions). Indeed, this Circuit's rules regarding jury instructions for criminal trials discourages distinctions between "general intent" and "specific intent." The drafters of this Circuit's criminal jury instructions concluded:

> The Committee recommends avoiding instructions that distinguish between "specific intent" and "general intent." In place thereof, the Committee recommends that instructions be given which define the precise mental state required by the particular offense charged. Accordingly, district judges should determine the requisite mental states as to each element of the charged offense and instruct thereon.

Commentary 6.02, Specific Intent—General Intent, *Federal Criminal Jury Instructions of the Seventh Circuit* 79 (1980).

Our review of the record does not indicate that the magistrate improperly instructed the jury. "As long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal." *United States v. Patrick,* 542 F.2d 381, 389 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *see also United States v. Perlaza,* 818 F.2d 1354, 1358 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987). The magistrate who tried the case carefully defined the terms "willfully" and "know-

ingly," which are used in § 553. He also told the jury: "[Y]ou are instructed that you must find that it was Richard Gardner's intent to modify and distribute for sale equipment intended by him for the unauthorized reception of communication services offered over a cable system." Tr. 5–67.

█ Gardner's tendered instructions regarding specific intent do not provide further substantive guidance on the required intent. His proposed Instruction No. 13 states:

> With respect to the modifying and distributing of equipment, the government must prove beyond a reasonable doubt specific intent.... Specific intent, as that term implies, means more than the general intent to commit an act. To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

Pleadings at 76. Gardner's Instruction No. 14 merely states: "You are instructed that specific intent on the part of Richard Gardner is essential to constitute the crime charged, i.e. the sale of equipment for unauthorized interception of cable services." Def.App. at 87.

Because we find that Gardner's suggested instructions do not differ substantively from the instructions actually given by the trial court, we do not find that he was unduly prejudiced by the denial of his proffered instructions.

### V

█ We must now address Gardner's contentions that the evidence adduced at trial was insufficient to sustain his conviction. When reviewing a challenge to the sufficiency of the evidence, we must view the evidence "in the light most favorable to the government in determining whether 'any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986)

(quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)); *see also Perlaza,* 818 F.2d at 1358.

Gardner asserts that private statements regarding the illegal use of the black box which were made prior to the sale are mere sales "puffery" and should not be considered on the issue of specific intent. Moreover, Gardner claims that he should not be held legally responsible for the uses of the boxes because he gave Perrin the option of locking out the available illegal movie services, and because he allegedly presumed that Perrin would pay for any premium services received. Gardner also claims that his "Notice of Warning," which disclaimed any responsibility for illegal use of the black box, shifted the responsibility to the purchaser. Finally, Gardner contends that because § 553 has not been construed in a criminal context before, his alleged uncertainty as to the illegality of the sale negates his specific intent.

It is clear that throughout his discussions with Perrin the appellant sought to avoid liability for actions he knew were illegal. While Gardner points to his "Notice of Warning" and his statements that the sales at issue fall within the "gray area of the law" to disclaim his liability, such statements establish that he was well aware that his actions were unlawful. This Court in *ON/TV of Chicago v. Julien,* 763 F.2d 839 (7th Cir.1985), found that a similar disclaimer of liability, which placed full responsibility for the illegal use of the cable converter on the purchaser, did not deprive the plaintiff cable companies of causes of action for injunctive relief under another provision of the Federal Communications Act. "Whatever the attempted legal effect of the defendant's disclaimer, the ultimate trier of fact could easily find that it was a transparent attempt to deny the patent illegality of the defendant's acts...." *Id.* at 844.

Moreover, Gardner's communications with Perrin prior to the purchases indicate his true intent regarding the sale of the black boxes. Gardner's entry into the computer bulletin board service on August 18 and 19, 1985, stated in part:

You sound really hungry to save some bucks on cable. Well, I have available for sale ... a "cable box" that will receive \*ALL\* of the channels on WAVE while you subscribe to only "basic" service for $2.95 a month.... The box goes for $250 and the remote is an additional $35 (plus sales tax). Since WAVE would charge you $79 a month for all-channel service, you can see that it would pay for itself in less than 4 months....

The brand name of the "box" is GTE–Sylvania. WAVE's computer \*CANNOT\* detect it or affect it in any way....

There was a new law that went into effect in January of this year that tends to make the sales of such boxes illegal.... The law says that it is illegal to sell unscrambling devices to people who are not authorized to receive the scramble programming in question....

My policy in selling these boxes has been to keep it low-key and generally deal with people who I know are "cool"....

Government *Exhibit* 6; *see* Tr. 2–195 to 199.

The appellant claims that his communications with Perrin prior to the sales of the boxes constitute mere "puffery." Our review of the record indicates that his statements were not merely attempts to sell the cable converter boxes, but attested to his knowledge that the boxes would be used illegally. There is a major difference between exaggerating the benefits of a particular good, and relying on the beneficial illegal aspects of the good to sell the product. Moreover, we note that even *after* the first sale of the black boxes on October 7, 1985, Gardner implicitly acknowledged the illegality of the sales transaction to Perrin. During their telephone conversation on December 5, 1985, Gardner stated:

The last thing in the world that say Wave Cable would want, is for some kind of a court suit or something to be filed, and have it filed and splattered all over the newspaper, because now, that is ... gonna break the bubble that the cable company has been handing out the people.... [T]hey make the average person tend ta [sic] think that their system's security is fool proof.

... Now if all of a sudden its [sic] splattered all over the paper [the availability of cable converter boxes] ... John Q. Public that reads the newspaper ... all of a sudden now he's gonna start ... trying to find some other dealer where he can buy one of these [converter boxes].

Government *Exhibit* 9.

Given Gardner's obvious knowledge of the illegality of his sales to Perrin, as well as his demonstration of how to tap the illegal benefits of the black boxes during the October 7, 1985 sale to Perrin, we can only conclude that the evidence sufficiently established Gardner's specific intent to violate the law.

## VI

Gardner further contends that the Government failed to establish his specific knowledge that the black boxes would be used illegally. He argues that the jury should have been instructed that the boxes were sold to Perrin for the sole and specific purpose of cable piracy, and that the evidence presented was insufficient to establish this sole and specific use.

Gardner's primary argument rests on his claim that the black boxes have both legal and illegal uses, so that the responsibility for the illegal use of the boxes must rest on the purchaser and the user. The language and legislative history of § 553 refute this interpretation. Section 553(a)(2) explicitly defines illegal assistance to "include the manufacture or distribution of equipment *intended* by the manufacturer or distributor ... for unauthorized reception of any communications service...." (emphasis added). On its face, the statute does not require actual use by the distributor or purchaser. Moreover, the House Report which accompanied the Cable Communications Policy Act indicates that the distributor's intent is the dispositive factor under § 553. "[I]f a manufacturer *intends* that equipment he produces, or a distributor *intends* that equipment he distributes,

or a retailer *intends* that equipment he sells, be used for interception or reception of services provided over a cable system, such person would be liable for assisting such activities." H.R. REP. NO. 934, 98th Cong., 2d Sess. 83–84 (1984), *reprinted in* 1984 U.S. CODE CONG. & ADMIN.NEWS 4655, 4720–21 (emphasis added).

■ Gardner points out that the legislative history also indicates that the Cable Communications Policy Act was not meant to penalize manufacturers and distributors who do not intend for their equipment to be used illegally. According to the House Report:

> The Committee does not intend that manufacturers, distributors or retailers be subject to liability under this section if they are engaged in the production or sale of a device or equipment which is used for legal purposes merely because the same device or equipment is capable of being used for unauthorized reception of cable service, *if* they do *not* provide the equipment *with the intent or specific knowledge* that it will be used for the unauthorized reception of cable service. Thus, the Committee does not intend a person's clearly legal conduct to become illegal because of the actions of others about which such person had no knowledge or no intention to assist.

H.R. REP. NO. 934, 98th Cong., 2d Sess. 84 (1984), *reprinted in* 1984 U.S. CODE CONG. & ADMIN.NEWS 4721 (emphasis added). The jury found that Gardner *did* intend the black boxes to be used illegally; thus, he clearly does not qualify as an innocent and inadvertent facilitator of an illegal transaction.

■ Despite this compelling legislative history, Gardner asserts that two previous cases, *Shenango Cable TV, Inc. v. Tandy Corp.*, 631 F.Supp. 835 (W.D.Pa.1986), and *ON/TV of Chicago*, 763 F.2d at 839, support his claim that a sole and specific purpose of piracy is required under § 553. In *Shenango*, the federal district court refused to impose civil damages on the defendant company because the black boxes at issue could not be used for pirating and, more importantly, were not intended to be

used illegally. It stated that "the manufacturer, retailer or distributor of the equipment in question is liable *only if* he *intends* that the equipment he produces and sells be used for the interception or pirating of cable signals and the equipment is designed solely and specifically for that purpose." *Shenango*, 631 F.Supp. at 838. The court further stated that the equipment should be designed specifically for an illegal purpose because it sought to differentiate between that equipment which merely has the *potential* for illegal use from equipment clearly intended for such use. However, the court in *Shenango* further stated: "The legislative history of Section 633 [47 U.S.C. § 553], as well as the unambiguous language contained therein, makes it clear that Section 633 of the Cable Act is an anti-pirating statute and a violation will be found *only where the 'intent'* is to pirate cable signals." 631 F.Supp. at 838 (emphasis added). Clearly, "intent" is the focal point for determining whether § 553 has been violated.

Our decision in *ON/TV of Chicago* also does not support Gardner's arguments. In that case, the defendant sought to avoid a preliminary injunction on the sale of its decoder devices, which enabled purchasers to obtain pirated cable television services. The defendant was charged with violating a different statute, 47 U.S.C. § 605 of the Federal Communications Act, which on its face does *not* require a willful and knowing violation of the Act. *ON/TV of Chicago*, 763 F.2d at 843.

The trial court instructed the jury that three essential elements must be proven in order to establish a § 553 violation:

> First, that [Gardner] assisted in intercepting and receiving communication services offered over a cable system. Second, that [Gardner] undertook this action willfully and knowingly. And, Third, [sic] that [Gardner] undertook this action for the purpose of his commercial advantage and private financial gain.

Tr. 5–66. The court further instructed the jury that "the term 'assist in intercepting and receiving' includes the manufacture or distribution of equipment intended by the

manufacturer or distributor for unauthorized reception of any communication services offered over a cable system." *Id.* at 5–66 to 67.

Our analysis indicates that the trial court did not err in its jury instructions. To convict under § 553, the jury was not required to find that the black boxes were sold for the sole and specific purpose of cable piracy, nor that the boxes were actually used illegally. Rather, the jury only needed to find that Gardner *intended* the black boxes to be used for the unauthorized reception of cable service when he sold the boxes to Perrin. The trial court properly instructed the jury in this regard.

## VII

Gardner's final contention is that the trial court abused its discretion in sentencing him by considering his prior conviction for wire fraud, which had been set aside under the Federal Youth Corrections Act, 18 U.S.C. § 5021(b). In sentencing Gardner, the trial court determined that a forty-five day term of incarceration would be appropriate after considering his previous conviction.

The Federal Youth Corrections Act ("YCA"), which has been repealed,[2] gave the trial judge discretion in unconditionally discharging the convicted youth offender from probation prior to the expiration of the maximum term of probation. As the Supreme Court stated in *Tuten v. United States*, 460 U.S. 660, 103 S.Ct. 1412, 75 L.Ed.2d 359 (1983): "Congress' purpose in adopting § 5021 [the YCA] was to promote the rehabilitation of youth offenders by providing a substantial incentive for positive behavior while serving a sentence under the YCA." *Id.* at 664, 103 S.Ct. at 1415.

While a trial judge is not unconstrained when sentencing, it is well established that he has great discretion in sentencing a convicted person. Trial judges may rely on a broad range of information, including

"alleged criminal activity for which the defendant has not been prosecuted, illegally obtained evidence and hearsay evidence." *United States v. Plisek*, 657 F.2d 920, 926 (7th Cir.1981) (citations omitted); *see also Smith v. United States*, 551 F.2d 1193, 1195–96 (10th Cir.), *cert. denied*, 434 U.S. 830, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977). Consideration of charges pending in another case has even been permitted. *See United States v. Haygood*, 502 F.2d 166, 171–72 (7th Cir.1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 812 (1975). As we have stated previously: "[A] sentencing court may consider all prior criminal activity of a defendant, not just that which results in a conviction." *Plisek*, 657 F.2d at 928.

Moreover, although YCA allows a judge to set aside a conviction, it does not allow for the expungement of a court *record* of a trial and conviction. *United States v. Doe*, 556 F.2d 391, 393 (6th Cir.1977); *United States v. McMains*, 540 F.2d 387, 389 (8th Cir.1976); *see also United States v. Klusman*, 607 F.2d 1331, 1334 (10th Cir.1979). The court record remains available for a trial court to consider when sentencing a defendant for a subsequent conviction. As the Ninth Circuit has already held, the record of a conviction that has been set aside under the YCA can be considered by a trial court in determining an appropriate sentence. *See United States v. Campbell*, 724 F.2d 812, 812–13 (9th Cir.1984).

In the case before us, Gardner does not allege that his prior conviction was used to convict him. Rather, the prior conviction was used to sentence him for a crime that was similar in nature. In his previous conviction, Gardner pleaded guilty to defrauding the state telephone company by constructing and using "blue boxes" that permitted the user to make long distance telephone calls without paying for them. At the sentencing hearing, the mag-

---

2. The YCA was formerly codified at 18 U.S.C. §§ 5005 *et seq.* It has since been repealed by the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 218(a)(8), 98 Stat. 1837, 1027 (1984), effective October 12, 1984. We note that "the repeal of the YCA is an *ex post* 

*facto* law to the extent that it precludes a court from considering the YCA in sentencing a youth offender who committed an offense prior to the repeal of the [Youth Corrections] Act." *United States v. Countryman*, 758 F.2d 574, 579 n. 2 (11th Cir.1985).

istrate made clear that he was considering the prior convictions for the "individual" or rehabilitative aspect of sentencing. R. 6–52. Taking into account the prior conviction for sentencing purposes was well within the magistrate's discretion. Furthermore, because the rehabilitative purposes of the YCA have not been served, as evidenced by Gardner's second conviction for a similar crime, we do not find that he was unduly prejudiced by consideration of this prior conviction.

### VIII

For all of the foregoing reasons, the judgment of the district court is

AFFIRMED.