124 F.3d 1044
 97 Cal. Daily Op. Serv. 7071, 97 Daily Journal
D.A.R. 11,408,
9 Communications Reg. (P&F) 402
CONTINENTAL CABLEVISION, INC., Plaintiff-Appellee,
v.
Alvin I. POLL; Cabletronics; Darryl S. Poll; Pacific
Cable Company, Inc.; Republic Cable Products,
Inc., Defendants-Appellants.
 No. 96-55308.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 4, 1997.
Decided Sept. 2, 1997.
 
 Robert M. Levy, Woodland Hills, CA, for defendants-appellants.
 Daniel J. Lefkowitz, William Jung, Daniel J. Lefkowitz, P.C., Jericho, NY, and Michael R. Weinstein, Ferris, Britton & Proctor, San Diego, CA, for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California; David V. Kenyon, District Judge, Presiding. D.C. No. CV-93-02310-KN.
 Before: SCHROEDER and O'SCANNLAIN, Circuit Judges, and BURNS,* District Judge.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether there was sufficient evidence of intent to hold manufacturers and distributors of cable converter-decoders civilly liable for assisting customers in the unauthorized reception of cable television programming.
 
 
 2
 * Continental Cablevision, Inc. ("Continental") is a multiple system cable television operator which constructs, operates, and maintains cable systems throughout the United States. Continental operates pursuant to franchise agreements awarded by various municipalities and political subdivisions, and it provides cable services to homes and businesses within its franchise areas. Continental's cable television services are private communication signals, not intended for public use, and are offered and made available only to authorized, paying subscribers. The programming Continental offers comes in various packages, which include broadcast television channels, premium channels such as Home Box Office or Cinemax, and pay-per-view services. Subscribers are billed on a monthly basis for each service they select.
 
 
 3
 To prevent subscribers from receiving and viewing programming services for which they have not paid, Continental encrypts or "scrambles" its premium and pay-per-view channels. A converter-decoder or "black box" is required to view any scrambled programming. The boxes are specifically programmed so as to allow subscribers to access only the amount of cable programming they have purchased. Subscribers generally rent the converter-decoders from Continental, but others sometimes purchase their own equipment from independent manufacturers and distributors.
 
 
 4
 The converter-decoders which Continental provides to its subscribers incorporate a feature known as "addressability." A converter-decoder is "addressable" if the cable operator may, by remote control, change an individual subscriber's level of service or authorize the viewing of a pay-per-view program without having to send a technician to the viewer's home to make physical adjustments. A central computer sends a signal to the converter-decoder instructing it to descramble the programs requested (and paid for) by customers.
 
 
 5
 There is a nationwide black market of "pirate" converter-decoders which descramble cable programming and enable some to receive premium and pay-per-view services without paying the cable operator. To protect against this unauthorized reception of cable programming, Continental sends out electronic "bullets" or impulses which disable converter-decoders that are stealing cable signals. In addition, in response to the pirating of cable services, the Federal Communications Commission ("FCC") has promulgated regulations regarding the manufacture, distribution, and use of converter-decoders. These regulations require that any person manufacturing, distributing, or marketing converter-decoders for a cable system have prior FCC approval.
 
 
 6
 Alvin Poll, Cabletronics, Darryl Poll, West Coast Electronics, Pacific Cable Company, Inc., Cable Equipment Brokerage Co., and Republic Cable Products, Inc. (collectively, "Poll") are manufacturers, distributors, and vendors of cable converter-decoders. The equipment that Poll distributed was modified to be both non-addressable and "bullet-proof," and Poll advertised these converter-decoders as such. On October 19, 1992, the Los Angeles Police Department executed a search and seizure warrant for the premises of Pacific Cable Company and Cable Equipment Brokerage. That same day, the Las Vegas Police Department executed a search and seizure warrant for the premises of Republic Cable Products. Thousands of converter-decoders and business documents were seized at both locations. Among the documents seized were sales invoices and correspondence from purchasers who had returned Poll's converter-decoders, complaining that the devices did not descramble all the pay channels offered on the purchasers' local cable television systems.
 
 
 7
 On April 21, 1993, Continental brought this action pursuant to sections 553 and 605[1] of the Communications Act of 1934 (the "Communications Act"), as amended, 47 U.S.C. §§ 553 and 605,[2] alleging that Poll manufactured, sold, and distributed converter-decoders while knowing and intending that these devices be used for the unauthorized reception of cable television programming. Section 553(c)(1) grants a private right of action to an aggrieved person for a violation of § 553(a)(1). Section 553 contains both criminal and civil provisions: subsection (b) establishes criminal sanctions and subsection (c) provides for civil remedies. Only civil remedies are involved in this appeal.
 
 
 8
 Following a court trial on August 1-2, 1995, the district court found Poll jointly and severally liable for 2,244 violations of § 553. The district court assessed damages at the rate of $500 for each converter-decoder sold to Continental's subscribers, for a total damage award of $1,122,000. The district court also entered a permanent injunction, and subsequently entered an order awarding Continental $259,917.80 for attorney fees and $2,393.42 for costs. Poll brought this appeal on February 22, 1996, contesting the court's finding of liability under § 553, and the award of damages and attorney fees.
 
 II
 
 9
 The language of 47 U.S.C. § 553 clearly states that manufacturers and distributors of converter-decoders are liable only if they intend to assist customers in unauthorized reception. The statute reads in material part:
 
 
 10
 (1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
 
 
 11
 (2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).
 
 
 12
 Because converter-decoders indeed have lawful uses, the statute requires a showing that defendants have the intent to assist in the unauthorized interception or reception to establish liability under § 553. Poll contends that Continental offered no evidence that it intended any of the 2,244 converter-decoder sales to facilitate the viewing of unpurchased programming.
 
 
 13
 * Contrary to Poll's bare assertion, there is evidence in the record to demonstrate that it had the intent or knowledge that its devices would be used to receive unauthorized programming. For instance, (1) Poll was not registered with the FCC to sell cable boxes;[3] (2) Poll's boxes had been modified to descramble all TV channels including premium channels and pay-per-view; (3) Poll's boxes were non-addressable; (4) Poll advertised its boxes as alternatives to the cable companies' boxes--not as second boxes to be used legally by current cable subscribers; (5) Poll advertised its boxes as being "bullet proof"--that is, as being capable of defeating cable companies' anti-cable theft security measures;[4] (6) Poll received letters from customers which indicate that its converter-decoders were used as primary, not as secondary, boxes; and (7) Continental Investigator Dennis Debbaudt's declaration revealed that Poll's boxes were capable of descrambling all of Continental's scrambled channels, including all the premium channels and pay-per-view.
 
 
 14
 By removing addressability from its converter-decoder devices and modifying them to descramble constant pay-per-view programming, Poll effectively defeated all of Continental's security measures, thereby allowing the user to receive unlimited premium and pay-per-view programming free of charge.[5]
 
 B
 
 15
 The only other circuit court which has squarely addressed § 553 liability is the Seventh Circuit which considered an appeal from the criminal provision of the same statute.[6] See United States v. Gardner, 860 F.2d 1391, 1399 (7th Cir.1988), cert. denied, 490 U.S. 1023, 109 S.Ct. 1751, 104 L.Ed.2d 187 (1989). In Gardner, the defendant was convicted of violating § 553 for willfully and knowingly assisting in the unauthorized interception and reception of cable services. He appealed on the ground that "the government failed to establish, and the trial court failed to instruct, that the sole and specific purpose of Gardner's black box was the unlawful interception of cable programming, and that [the customer] actually used the boxes." Id. at 1394. The Seventh Circuit rejected this argument and applied reasoning that we now adopt. Id. at 1397-99.
 
 
 16
 After reviewing the language and legislative history of the statute, the court concluded that:
 
 
 17
 To convict under § 553, the jury was not required to find that the black boxes were sold for the sole and specific purpose of cable piracy, nor that the boxes were actually used illegally. Rather, the jury only needed to find that Gardner intended the black boxes to be used for the unauthorized reception of cable service when he sold the boxes....
 
 
 18
 Id. at 1399. The fact that the cable boxes that the defendant sold allegedly had both legal and illegal uses did not preclude convicting the defendant of willfully and knowingly assisting in unauthorized interception and reception of cable service.
 
 
 19
 The same principle applies in this civil case involving a private right of action by an injured cable television system operator. The fact that Poll's boxes had legal uses does not insulate it from civil liability where the evidence establishes that Poll knew and intended the "black boxes" to be used for the unauthorized reception of cable television programming.
 
 III
 
 20
 The final issue to be decided is whether, under 47 U.S.C. § 553(c)(3)(A)(ii),[7] statutory damages may be assessed for each and every violation separately, or whether a maximum statutory damages amount encompasses all violations. The district court chose the former interpretation, awarding statutory damages in the amount of $500 for each of the 2,244 devices manufactured and sold by Poll in violation of § 553(a)(1), for a total of $1,122,000.
 
 
 21
 Continental contends that § 553(c)(3)(A)(ii) mandates the multiplication of statutory damages for each and every device supplied to customers in violation of the Act. It contends that district courts in both Time Warner Cable of New York City v. U.S. Cable T.V., Inc., 920 F.Supp. 321, 328-29 (E.D.N.Y.1996) (quoting § 553(b)(3) to support multiplication of civil damages by the number of devices) and Time Warner Cable of New York City v. Freedom Electronics, Inc., 897 F.Supp. 1454, 1459 (S.D.Fla.1995) ("Each ... converter-decoder manufactured or distributed in violation of § 553 is a separate violation of the statute.") have adopted this approach. Continental responds that the "$10,000 maximum for all violations" interpretation would lead to the absurd conclusion that a party might recover an unlimited amount of actual compensatory damages, while limiting total statutory damages at $10,000 for an unlimited number of violations. Continental also argues that to limit total statutory damages to $10,000 would create a de facto licensing fee to violate the Act, because violators could manufacture or distribute as many boxes as possible without facing greater damages.
 
 
 22
 Poll, on the other hand, asserts that because the plain language of § 553(c)(3)(A)(ii) provides for an award of statutory damages of $250 to $10,000 "for all violations involved in the action," the district court may not multiply the damages by the number of cable boxes distributed in violation of the Act. It argues that the district court misapplied the statutory limits on damages to each violation, rather than all violations involved in the action. Poll also contends that the statute's $10,000 maximum limit on the total amount of recovery pursuant to § 553(c)(3)(A)(ii) is part of a coherent statutory scheme for awarding civil damages which would be undermined by the district court's interpretation. We agree with Poll's statutory construction.
 
 
 23
 We first pause to consider the "coherent statutory scheme" for awarding civil damages for § 553(a)(1) violations. A plaintiff may elect either to prove actual damages and profits of the violator attributable to the violation, or to claim statutory damages. See 47 U.S.C. § 553(c)(3)(A). Continental chose the latter course. Contrary to its claim, there is nothing in the least absurd about setting a cap on statutory damages while allowing unlimited recovery of actual damages. We are mindful that "statutory damages may serve completely different purposes than actual damages." Nintendo of America v. Dragon Pac. Int'l, 40 F.3d 1007, 1011 (9th Cir.1994). If an aggrieved party thinks that the statutory damages are not adequate, that party may seek to prove actual damages. Continental elected to claim only statutory damages. If an award of $10,000 for each violation is allowed, then few if any plaintiffs would ever avail themselves of actual damages, because recovery of statutory damages, which requires no proof of loss, will likely be as high or higher than actual damages.
 
 
 24
 This court begins with the "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The language of the statute is quite clear: the aggrieved party "may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250.00 or more than $10,000.00." We turn to the general dictionary definition. "All" means "the whole amount or quantity," and "sum" means "the aggregate of two or more numbers." Webster's Third New International Dictionary 54, 2289 (1986). By its plain language, Congress clearly intended for the maximum limit on statutory damages to apply to the total award of damages in the action.
 
 
 25
 Continental, however, argues that Congress amended § 553(b)(3) in 1992 to provide that "[f]or purposes of all penalties and remedies established for violations of [§ 553(a)(1) ], the prohibited activity established herein as it applies to each such device shall be deemed a separate violation." Congress enacted this subsection, so Continental's argument goes, to parallel the analogous § 605(e)(3)(C), providing for a separate assessment of statutory damages for each § 605(e)(4) violation. However, we cannot overlook the fact that Congress changed the statute on the criminal side to read "each such device shall be a separate violation," yet left unchanged the word "all" on the civil side of the statutory remedies. That distinction is indeed a distinction with a difference, and congressionally intended as such.
 
 
 26
 Assuming arguendo that the plain language of § 553(c)(3)(A)(ii) is ambiguous, a review of the amendment and its scant legislative history suggests that, despite the presence of the word "remedies," Congress intended only to bring criminal sanctions for violations of § 553(a)(1) into "conformity" with those for criminal sanctions for violations of § 605(a). See 47 U.S.C. § 553(b)(3) ("separate violation" language in subsection (b) (criminal), as opposed to (c) (civil)); H.R. Conf. Rep. No. 102-862, at 94 (1992), reprinted in U.S.C.C.A.N. 1231, 1276 (stating that amendment "amends § 553(b)" rather than the entire section). In amending § 553(b), Congress increased the criminal penalties for willful violations of § 553(a)(1) for commercial advantage or private financial gain to mirror those in § 605(e)(2). Congress, however, left untouched the disparity in civil damages for willful violations of the respective statutes for commercial advantage or private financial gain. See 47 U.S.C. § 605(e)(3)(C)(ii) (court may enhance award by up to $100,000); id. § 553(c)(3)(B) (court may enhance award by up to $50,000). This is not what one would expect if the intent of Congress was to bring the civil remedies under § 553 into "conformity" with those under § 605.
 
 
 27
 The Second Circuit embraced the same statutory construction in International Cablevision, Inc. v. Sykes, 997 F.2d 998 (2d Cir.1993). Although our sister circuit had before it only a single violation, we believe its discussion provides persuasive reasoning in support of our statutory interpretation.[8] It stated in part:
 
 
 28
 Further, the minimum statutory award of $250 under § 553 is for "all violations involved in the action," id. § 553(c)(3)(A)(ii), whereas the minima of $1,000 and $10,000 for violations of § 605(a) and § 605(e)(4), respectively, are to be awarded for "each violation" of the pertinent subsection, id. § 605(e)(3)(C)(i)(II). See also id. § 553(c)(3)(A)(ii) (maximum statutory damages for all violations of § 553 set at $10,000); id. § 605(e)(3)(C)(i)(II) (maximum statutory damages for each violation of § 605(a) and § 605(e)(4) set at, respectively, $10,000 and $100,000).
 
 
 29
 Id. at 1007 (emphasis added). With the aforementioned exceptions, district courts also have interpreted § 553(c)(3)(A)(ii) to apply to the total award of damages rather than the amount of damages for each violation. See, e.g., Cablevision Systems Corp. v. Muneyyirci, 876 F.Supp. 415, 422 (E.D.N.Y.1994) (interpreting $10,000 as maximum award for multiple violations); International Cablevision, Inc. v. Noel, 859 F.Supp. 69, 78 n. 6 (W.D.N.Y.1994) (same), rev'd on other grounds, International Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir.1996); American Cablevision of Queens v. McGinn, 817 F.Supp. 317, 320 (E.D.N.Y.1993) (same).
 
 
 30
 Unless and until Congress changes the word "all" in § 553(c)(3)(A)(ii) to "each," it is inappropriate for a court to multiply a civil damage award under § 553 based on the number of violations involved in a single action.
 
 IV
 
 31
 For the foregoing reasons, the district court's judgment as to the finding of § 553 liability is AFFIRMED. The district court's statutory damages award is REVERSED and REMANDED for further proceedings not inconsistent with this opinion. AFFIRMED in part; REVERSED in part; REMANDED.
 
 
 32
 Each party to bear its own costs.
 
 
 
 *
 Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The district court held that Poll's actions did not violate § 605. Because Continental subsequently dismissed its cross-appeal on this issue, we do not consider § 605 liability in this appeal
 
 
 [2]
 Congress enacted both § 553 and the provision that ultimately became § 605(e)(4) as part of the Cable Communications Policy Act of 1984 ("Cable Act"), which amended the Communications Act of 1934. Section 553 was "primarily aimed at preventing the manufacture and distribution of so-called 'black boxes' and other unauthorized converters which permit reception of cable service without paying for the service." H.R.Rep. No. 98-934, at 84 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, 4721
 At the same time as providing for the protection of services offered over a cable system in § 553, the Cable Act made substantial amendments to § 605 of the Communications Act. The existing § 605 was retained without alteration as § 605(a), and four new subsections, designated as subsections (b)-(e), were added. The new provisions were intended to address "the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations." 130 Cong. Rec. S. 14, 286 (October 11, 1984) (statement of Sen. Packwood), reprinted in 1984 U.S.C.A.N.N. at 4745.
 
 
 [3]
 Contrary to Poll's position, Poll stipulated that the "FCC promulgated regulations regarding the manufacture, distribution and use of converter-decoders [which] require any person manufacturing, distributing or marketing converter-decoders for a cable system in the United States to have prior FCC authorization and approval" and that "none of the defendants have applied for or received FCC authorization to market, sell or manufacture converter-decoders." Joint Pre-Trial Order, August 18, 1995
 
 
 [4]
 Poll admits as much in its brief: "Defendants themselves modified the converter-decoders which they sold to remove the addressability feature and to activate all channels which the subscriber could be purchasing from the cable company. In order to protect their products from being damaged by 'bullets,' Defendants included a 'bullet-proof' feature in their converter-decoders." (Appellant's Opening Brief at 7) (citations omitted)
 
 
 [5]
 Alvin Poll himself admitted that purchasers would be able to receive unlimited pay-per-view programming without a cable operator's authorization or knowledge:
 Q: Now, the devices that you offer descramble pay per view on a constant basis, correct?
 A: Yes.
 Q: And are not addressable, so that a cable operator cannot determine whether or not pay per view is being viewed; is that correct?
 A: Yes.
 Q: And as a consequence, the cable company can't bill your customer, if pay per view is being viewed; is that correct?
 A: If they were watching with their own box; and then, watching the same movie using my box in another room, they certainly can.
 Q: Well, wouldn't it be fair to say that if your customer turns on pay per view using your box, then the cable operator has no way of knowing and no way of billing that viewing; is that correct?
 A: That's correct.
 (Testimony of Alvin Poll, August 2, 1995).
 
 
 [6]
 See also Time Warner Cable of New York v. Cable Box Wholesalers, Inc., 920 F.Supp. 1048, 1053 (D.Ariz.1996); Time Warner Cable of New York City v. Freedom Electronics, 897 F.Supp. 1454, 1459 (S.D.Fla.1995); Oceanic Cablevision, Inc. v. M.D. Electronics, 771 F.Supp. 1019, 1025 (D.Neb.1991)
 
 
 [7]
 Section 553(c)(3)(A)(ii) reads:
 (ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250.00 or more than $10,000.00 as the court considers just.
 
 
 [8]
 At oral argument, Continental asserted that Sykes did not consider the 1992 amendments and, thus, it is not on point. We disagree. Although the Second Circuit did not discuss the amendments as such, we note that the amendments became effective December 5, 1992, that Sykes was submitted April 22, 1993, and that the court cited to the 1993 version in its opinion