**INTERNATIONAL CABLEVISION, INC.,**
doing business as Adelphia Cable,
Plaintiff–Appellant,

v.

**John SYKES, Defendant–Appellee.**

No. 1337, Docket 92–7877.

United States Court of Appeals,
Second Circuit.

Submitted April 22, 1993.

Decided June 15, 1993.

Law Offices of Daniel J. Lefkowitz, Jericho, NY (Daniel J. Lefkowitz, William B. Jung, of counsel), for plaintiff-appellant.

Bouvier, O'Connor, Buffalo, NY (Chris G. Trapp, of counsel), for defendant-appellee.

Before: TIMBERS, KEARSE, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff International Cablevision, Inc. ("Cablevision"), the operator of a cable television system, appeals from a final judgment entered in the United States District Court for the Western District of New York following a bench trial before John T. Curtin, *Judge,* dismissing its complaint against defendant John Sykes alleging his sale of a device designed to unscramble Cablevision's signals in violation of 47 U.S.C. §§ 553(a) and 605 (1988) and state law. The district court found that there was no violation because Sykes had purchased the device for an innocent purpose and had sold it only to recover its cost. On appeal, Cablevision contends that the uncontested evidence established a violation. For the reasons below, we agree that a violation of at least § 553 was established, and we vacate the judgment and remand for further consideration of § 605 and for the granting of appropriate relief.

## I. BACKGROUND

Cablevision operates a cable television system in western New York State, including the town of Tonawanda, distributing programming to subscribers within its franchise area. It

receives its programming via satellite from the originator of the programming. The satellite signal is received at an earth station and transmitted to [Cablevision's] "head-end," which is a satellite dish and electronics system used to convert the signals to a form which can be transmitted over cable. The cable signal is then transmitted over coaxial cable wiring, installed and maintained by [Cablevision], and fed into subscribers [*sic*] homes by equipment provided by [Cablevision].

(Affidavit of Cablevision's General Manager of Operations, Thomas Haywood, dated November 21, 1990, ¶ 4.) Cablevision charges a monthly fee for its service and additional fees for certain premium channels such as HBO, Showtime, and Pay–Per–View. The system is designed so that programming signals are delivered to subscribing households for certain channels in scrambled form. Scrambled signals must then be deciphered by a device known as a "decoder" or "descrambler." Cablevision provides these devices to subscribers as part of the monthly charge for cable services.

Most of the facts relating to this lawsuit are not in dispute.

### A. *The Events and the Lawsuit*

In 1990, Cablevision had received information that Sykes was selling cable television "black boxes," *i.e.,* devices that would permit subscribers to view programs broadcast on premium channels without paying Cablevision for these services. Accordingly, in October 1990, Cablevision sent a private investigator, Sandra Helsel, to Sykes's place of business, where she told Sykes she wanted to purchase a cable television black box. Before selling the device to her, Sykes ascertained that she lived in Tonawanda rather than Buffalo, which made a difference as to the type of decoding device she would need. He sold her a black box for $250 and gave her an instruction sheet on how to connect it to a video recorder and a television set. Later testing by Helsel proved that the device decoded Cablevision's scrambled signals.

Helsel also told Sykes she had a friend in Buffalo who might be interested in purchasing such a device if the black box Helsel had just purchased worked well. Sykes promptly gave Helsel, without charge, a "yellow tag" for her friend and instructed her how to install it in the friend's cable box in Buffalo. He said it would allow reception of all channels except Disney. Helsel tape-recorded the entire conversation with Sykes.

In December 1990, Cablevision commenced the present action, asserting that Sykes's sale to Helsel violated, *inter alia*, 47 U.S.C. §§ 553(a)(1) and 605(e)(4). The complaint principally requested declaratory, injunctive, and monetary relief under 47 U.S.C. § 553(c) (1988) and *id.* § 605. Under § 605(e), Cablevision requested (a) actual damages plus Sykes's profits on the sales of all such unauthorized decoding devices, or, alternatively at Cablevision's election, statutory damages in the amount of $100,000 for each such violation, and (b) costs and attorneys' fees. After obtaining a preliminary injunction prohibiting Sykes from making any further unlawful sales of decoders, Cablevision moved for summary judgment. The motion was supported by, *inter alia*, an affidavit by Helsel, describing her visit to Sykes's shop, as summarized above, and attaching a transcript of the recorded conversation with Sykes. Helsel also stated that when she asked Sykes for a guarantee that the device she purchased would work, he stated that he had " 'at least [a] thousand' " such devices and that if the one she bought did not work it could be exchanged. (Affidavit of Sandra Helsel, dated April 30, 1991, ¶ 7.)

In opposition to the motion, Sykes submitted an affidavit in which he admitted selling the black box to Helsel in October 1990, but stated that he had purchased it several months earlier for approximately $250 at the behest of a special agent of the Federal Bureau of Investigation ("FBI"), with the understanding that the FBI would reimburse him for it. Sykes turned the unit over to the agent, who returned it to Sykes a few days later, saying that he had taken it to Cablevision for testing and that it did indeed decode Cablevision's signals. According to Sykes, the agent said he would check to see whether money was available to reimburse Sykes but was unsuccessful:

> 5. Several months later, after checking with the [agent] on several occasions and being told again in each instance that monies were not available for reimbursement, he told me that there would be no monies available to reimburse me. I then sold the unit to [Helsel].

> 6. I accrued no profit, nor do I have employees or agents or a network to manufacture or distribute or supply in any way the unit involved.

(Affidavit of John Sykes, dated July 12, 1991, ¶¶ 5, 6.) Sykes's position was that he had made the sale to Helsel only so that he would not sustain a loss. He denied being in the business of selling black boxes and denied having told Helsel that he had additional black boxes for sale.

Sykes also presented an affidavit from FBI Special Agent Glen C. Reukauf, which in part confirmed Sykes's affidavit, though it placed Sykes's acquisition of a decoding device for Reukauf in 1987 rather than in 1990. Reukauf stated that from 1984 to sometime in 1987, Sykes had occasionally obtained information for him to assist in investigations into violations of federal statutes prohibiting wire fraud and the interception of wire and electronic communications. According to Reukauf, in 1987 Sykes advised him that certain local individuals had developed a device to descramble an encryption scheme recently adopted by Cablevision, and Sykes furnished Reukauf with such a black box. Reukauf gave the box to one of Cablevision's investigators, who in turn gave it to a Cablevision technician for testing. Cablevision then returned the device to the detective, who returned the box to Reukauf, informing him that it did decode Cablevision's signal. Reukauf stated that he returned it to Sykes in the belief

> that the black box had been loaned to Mr. Sykes by someone who was involved in the illegal distribution of cable television decoders. It was your affiant's belief at that time, that Mr. Sykes would return the black box to the original distributor.

> Your Affiant was unaware at that time, that Mr. Sykes had purchased the black box with his personal funds. Mr. Sykes was never authorized by your Affiant, or anyone from the FBI, to resell the aforementioned cable television decoder, in an effort to recoup the funds which Mr. Sykes had expended for the purpose of purchasing the decoder.

(Affidavit of Glen C. Reukauf, sworn to August 28, 1991, ¶ 8.)

In a decision dated February 5, 1992 ("Summary Judgment Decision"), the district court denied Cablevision's motion for summary judgment, stating, in pertinent part, as follows:

> The fact that Mr. Sykes sold the box to Ms. Helsel is not contested, and it was clear from her affidavit that Sykes knew what the device was, what it would do, and that he clearly intended to violate the law.

Summary Judgment Decision at 4. The court concluded, however, that there were questions of fact as to when and how the black box had come into Sykes's possession. It stated that "[i]f in fact [Sykes] acted in behalf of the government in obtaining the device, there may be a good defense to this action. There must be a trial or hearing to resolve this material fact which is in dispute." *Id.*

### B. *The Trial and the District Court's Decision*

Thereafter, a one-day bench trial was held. The parties had stipulated to various facts relating to Cablevision's operations and the court's jurisdiction. The precise facts to which they stipulated are not spelled out in the record, though both sides appeared to agree that both §§ 553 and 605 were applicable, and that the "only real issue" for trial was "the circumstances under which Mr. Sykes came in possession of this box." (Trial Transcript July 20, 1992 ("Tr."), at 7 (Statement of Sykes's attorney).) At trial, Cablevision introduced the testimony of Helsel, which largely mirrored her affidavit, the black box she had purchased from Sykes, and the transcript of her conversation with Sykes. The transcript included the following:

> [SYKES]—Any problems at all, let me know.
>
> [HELSEL]—Okay.
>
> [SYKES]—Otherwise, like I said I got a thousand of them if I don't have one.
>
> [HELSEL]—A thousand?
>
> [SYKES]—At least a thousand.
>
> [HELSEL]—Wow, so that's like my guarantee?
>
> . . . .

> [HELSEL]—Thanks alot [*sic*]. I'll let you know. I'll come back. Great. If possible, I can get another one?
>
> [SYKES]—Yes. I've got 15/20 all the time.

(Tape Transcript.)

Both Sykes and Reukauf testified at trial and substantially confirmed the representations made in Sykes's affidavit as to why Sykes had obtained a black box for Reukauf in 1987. Reukauf, though stating that the black box in evidence here resembled the one Sykes had given him in 1987, was unable to testify that it was the same box. As to the events of 1990, Reukauf stated that neither he nor any other FBI agent ever authorized Sykes to sell the box and that he had not known Sykes would sell the box. Sykes admitted that neither any FBI agent nor any other government employee had told him to sell the black box.

As to Helsel's description of her conversation with Sykes, though his earlier affidavit had disputed Helsel's statement that he had said he had many black boxes for sale, Sykes did not persist in that denial in his testimony at trial. Rather, though claiming not to remember certain of his statements, Sykes did not dispute the accuracy of the transcript. He stated, "if you have—if she says it is it's probably true. . . . [T]here is no need to play the tape." (Tr. 31–32.)

Following the trial, the court dismissed the complaint. Stating that there had "clearly [been] a misunderstanding between Sykes and the agent," and that Sykes's acquisition of the decoder had actually benefited Cablevision, the court ruled that Cablevision had failed to prove a violation. The court stated that

> perhaps [Sykes] acted foolishly and maybe not in a businesslike way and sold the device here to the investigator. There is no question about that. But he didn't make any money on it. The best evidence we have is that he paid two hundred and fifty dollars plus some cost of mailing, and that is what he sold—he sold it to the investigator for two hundred and fifty dollars. So if anything he lost some money. So that there is no evidence here that there was any dealing for gain.

Now, it is true and the Court does take into consideration the fact that the instruction sheet went along with it. I suppose it would simply be part of the package, part of the box. And then as far as the other tags, that would be something which would indicate his knowledge of the business, but that is why Reukauf went to him in the first place, because he believed that he would know something about how this went on.... The only evidence we have here of his dealing is this one event. Other than that it's pure speculation. If the company believed that he was a serious source of these unlawful decoders they could have very simply sent either this investigator or somebody else to the shop and they would attempt to buy another box.

.... I find that under the circumstances that although the box was sold, that it was sold with the innocent purpose of Mr. Sykes in simply recouping his losses. Under the circumstances he should have acted in a different way, but I do not find that plaintiff has made its case that the sale was in violation of the law.

(Tr. 75–77.)

Judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Cablevision contends that, given the district court's factual findings, the court could not properly conclude that there was no violation of §§ 553(a)(1) and 605(e)(4). We agree at least with respect to § 553(a)(1).

### A. *Liability Under § 553*

Section 553 of 47 U.S.C. was enacted as part of the Cable Communications Policy Act of 1984 ("1984 Act"), Pub.L. No. 98–549, 98 Stat. 2779, in an effort to deal with "a problem which [wa]s increasingly plaguing the cable industry—the theft of cable service," including "gaining access to premium movie and sports channels without paying for the receipt of those services," H.R.Rep. No. 934, 98th Cong., 2d Sess. 83 (1984) ("H.R.Rep. 934" or "House Report"), *reprinted in* 1984 U.S.Code Cong. & Admin. News

("USCCAN") 4655, 4720. Section 553 provides in part that

> [n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
>
> (2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the ... distribution of equipment intended by the ... distributor ... for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. § 553(a)(1) and (2).

The undisputed facts, recognized in part in the district court's opinion denying Cablevision's summary judgment motion and framing the remaining issue for trial, as well as in certain of the court's findings after trial, leave no room for doubt that Cablevision established that Sykes had violated § 553(a)(1). Sykes did not claim that he was authorized by law or by Cablevision to intercept or assist in intercepting or receiving Cablevision's signals. The court stated that

> [t]he fact that Mr. Sykes sold the box to Ms. Helsel is not contested, and it was clear from her affidavit that Sykes knew what the device was, what it would do, and that he clearly intended to violate the law.

Summary Judgment Decision at 4. Sykes did not dispute that he knew the nature and unlawful purpose of the device he sold to Helsel, and the court noted that Sykes's knowledge of such devices was further confirmed by his giving the yellow tag to Helsel for the decoding of her friend's cable signals in Buffalo, and the fact that the FBI agent used Sykes as an informant with respect to such matters. Nor could there be any doubt that Sykes intended that the device he sold be used for the interception of Cablevision's signals; he inquired as to where Helsel lived, expressly in order to provide her with a device that would decode the type of signals she received; he furnished her with a set of instructions as to how to connect the device to her television set and video recorder; and he told her that if the box he gave her did

not work she could bring it back for an exchange.

The district court concluded, notwithstanding Sykes's knowing and unlawful intent, that there was no violation because (a) it credited the evidence that Sykes had obtained the device in good faith in the belief that he would be reimbursed for the cost, (b) found that Sykes had made just one proven sale, and (c) found that Sykes had acted with the "innocent purpose of . . . simply recouping his losses." None of these findings could justify a ruling that Cablevision had failed to establish a violation.

■ First, § 553(a)(1) contains no suggestion that its prohibition was meant to extend only to persons who are engaged in the continuing business or repeated conduct of selling such devices. Though the district court harked back to "dog bite" cases and "a rule of thumb that every dog was entitled to one bite" (Tr. 73), § 553 contains no suggestion that it imposes no liability unless there has been more than one sale.

■ Second, we disagree with the district court's view that there is no liability unless the seller of the unauthorized device has made a profit. Though the damages portion of § 553, see Part II.B. below, contains a reference to economic "gain," stating that the court may "increase the award of damages" if it finds that a willful violation was committed for purposes of "private financial gain," 47 U.S.C. § 553(c)(3)(B), there is no suggestion whatever in § 553(a)(1) that in the absence of financial gain there is no violation; and, indeed, there is no suggestion even in § 553(c)(3)(B) that "gain" means only a *net* gain.

■ Third, § 553 does not and was not intended to provide a good-faith defense against liability. Section 553(a)(1) provides that "[n]o person" shall assist in the unauthorized interception of cable signals. Though the damages portion of § 553 allows the court to "reduce the award of damages" if it finds that the violator "was not aware and had no reason to believe that his acts constituted a violation," 47 U.S.C. § 553(c)(3)(C), there is no suggestion in § 553(a)(1) that an unaware person even as thus described in

§ 553(c)(3)(C) is exempted from liability, much less any suggestion of such an exemption for one who "foolishly" (Tr. 73) sold the unauthorized device with the knowledge and intent that it would be used for a prohibited purpose. *Compare* 18 U.S.C. § 2520(d) (1988) (providing for, *inter alia*, good-faith defense to a private civil action for impermissible interception of an electronic communication). The Senate manager of the bill that led to the 1984 Act in describing the language "was not aware and had no reason to believe that his acts constituted a violation," which was used not only in § 553(c)(3)(C) but also in a parallel enforcement scheme that the 1984 Act added to 47 U.S.C. § 605, *see* Pub.L. No. 98–549, § 5, 98 Stat. at 2803 (codified at 47 U.S.C. § 605(d)(3)(C)(iii) (Supp. II 1984)), stated explicitly that this language was not intended to create a good-faith defense to an assertion of liability under § 605:

Subsection (C)(iii) also embodies the recognition that in those rare situations in which a violator of subsection (a) had absolutely no reason to believe that his acts constituted a violation of the law, the court may reduce the award to $100. *It is not intended that this provision serve in any way as a defense to a determination of liability* under subsection (a), but rather only as a provision to be exercised in the court's discretion for those rare instances of ignorance of the law on the part of one adjudged to have violated it.

130 Cong.Rec. 31,875 (1984) (Statement of Sen. Bob Packwood; emphasis added), *reprinted in* 1984 USCCAN at 4750–51; *see also* Pub.L. No. 100–667, § 205(11), 102 Stat. 3935, 3960 (1988) (codified at 47 U.S.C. § 605(e)(3)(C)(iii) (1988)) ($100 minimum provided by 1984 Act for violation of § 605 increased to $250 in 1988).

In sum, given (a) the language of § 553, which in no way suggests that there is no violation if an unauthorized sale for a prohibited purpose is knowing and intentional yet somehow in good faith, and (b) the express caveat in the legislative history that the identical language in § 605 did not create a defense to a determination of liability, we conclude that the district court here erred in

concluding that because Sykes had obtained the black box in good faith, he was absolved from liability in his decision to sell it to recover his cost. Even if the box Sykes sold to Helsel was the box he had innocently purchased three years earlier in the mistaken belief that the FBI would reimburse him for its cost, his sale of the box was concededly unauthorized and indisputably a knowing and intentional violation of the law. It is unfortunate if Sykes made a $250 error in 1987; but nothing in the statute allowed him to recover from his error by selling the box to assist in the theft of Cablevision's services, any more than he would have been entitled simply to demand or steal $250 from Cablevision directly. We conclude that the undisputed facts established as a matter of law that Sykes violated § 553(a)(1).

### B. *Damages Under § 553*

■ The closer questions center on the remedies to which Cablevision was entitled. Section 553(c) grants a "person aggrieved" by a violation of § 553(a)(1) a private right of action, *see* 47 U.S.C. § 553(c)(1), and provides that if that person prevails,

(2) [t]he court may—

(A) grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section;

(B) award damages as described in paragraph (3); and

(C) direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails.

(3)(A) Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:

(i) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; ... or

(ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

(B) In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000.

(C) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100.

47 U.S.C. §§ 553(c)(2) and (3)(A), (B), and (C).

■ The primary question is whether, having proven a violation, the aggrieved party may be denied all recovery of damages on the ground that the violator acted foolishly or with a purpose other than profit. Section 553(c)(2) states that the court "may" grant injunctive relief, attorneys' fees, and damages. The verb "may" generally denotes a grant of authority that is merely permissive. The initial impression of permissiveness here is furthered by a comparison of § 553(c)(2) with 47 U.S.C.A. § 553(b) (West 1991 & Supp.1993), which sets out mandatory criminal penalties for a person who has committed a willful violation. The latter provision states that such a person "shall" be fined or imprisoned. 47 U.S.C.A. § 553(b)(1) and (2). Nonetheless, any suggestion that use of the word "may" in 47 U.S.C. § 553(c)(2) was intended to grant the court unfettered discretion as to whether any damages at all should be granted seems to be belied by, *inter alia*, the provisions in § 553(c)(3)(B) and (C). Subsection (B), governing a violation found to have been willful and for purposes of commercial advantage or private financial gain, states that "the court *in its discretion* may" increase the damages awardable under § 553(c)(3)(A). *Id.* § 553(c)(3)(B) (emphasis added). Similarly, subsection (C), governing cases in which the court has found that the violator was unaware and had no reason to believe that his acts constituted a violation, states that "the court *in its discretion* may" decrease the

damages awarded to as low as $100. *Id.* § 553(c)(3)(C) (emphasis added). The inclusion in these two sections of the phrase "in its discretion," in juxtaposition to § 553(c)(2), which uses the verb "may" but does not include that phrase, seems to indicate that Congress did not use that verb, with respect to the award of damages, in the totally permissive sense.

An additional indication that Congress did not intend the court to have authority to deny completely an award of damages to a person aggrieved by a proven violation of § 553(a)(1) may be found in the fact that § 553(c)(2)(B) states that the court may "award damages *as described in paragraph (3)*." (Emphasis added.) Paragraph (3) provides that damages awarded by the court under § 553 "shall be" computed on the basis of actual injury or statutory damages. *Id.* § 553(c)(3)(A). If that section merely went on to specify an amount that could be awarded as statutory damages, one could read the combination of § 553(c)(2)(B) and § 553(c)(3)(A) as giving the court authority either to award or withhold damages, while merely specifying the method by which damages could be calculated. But § 553(c)(3)(A) goes on to provide that as statutory damages the aggrieved party is to recover "a sum of not less than $250." *Id.* § 553(c)(3)(A)(ii). Further, in providing that the court "in its discretion" may reduce the damage award against a violator who was not aware and had no reason to believe that his acts constituted a violation, Congress placed a limit on such a reduction, stating that the court could reduce that award to "a sum of not less than $100." *Id.* § 553(c)(3)(C). These specifications of minimum levels of statutory damages suggest that Congress intended that the court not have the power to deny an aggrieved person all damages for a proven violation, for it would make little sense to grant a court complete discretion to deny all damages, while imposing on it the duty, in the event that it decided to award any damages, to award a stated minimum amount.

The suggestion that when there has been a violation the court must award at least the minimum specified level of statutory damages also finds some support in the legislative history of § 553(c). The House Report on the bill that formed the basis of the 1984 Act described § 553(c)(2) as providing that the court "may" award actual or statutory damages, and it noted the range of statutory damages starting at $250 and the "discretion" of the court to reduce that minimum award to "not less than $100." H.R.Rep. 934, at 85, *reprinted in* 1984 USCCAN at 4722. Though it, like the statute as enacted, thus used the verb "may," the House Report suggested that the damages specified "must" be available and enforceable. Noting with approval the efforts of a number of states that had enacted their own statutes providing criminal and civil penalties for theft of cable service, the House Report stated that "this problem is of such severity that *the Federal penalties and remedies contained herein must be available* in all jurisdictions (*and enforceable* in state or Federal court) as part of the arsenal necessary to combat this threat." H.R.Rep. 934, at 84, *reprinted in* 1984 USCCAN at 4721 (emphasis added).

■ In sum, reading § 553(c) as a whole and in light of its legislative history, we infer that Congress intended that in any civil action in which a violation of § 553(a)(1) is proven, the aggrieved party is entitled to an award of at least $100 in damages if the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of § 553(a)(1), or an award of at least $250 in damages if the court does not make such a finding.

In the present case, the district court did not find that Sykes was not aware and had no reason to believe that his acts constituted such a violation, and its observations that Sykes obviously had "knowledge of the business" and "clearly intended to violate the law," together with the compelling evidence supporting those observations, plainly preclude any such finding. Thus, Cablevision was entitled to an award of at least $250 as statutory damages for the violation of § 553(a)(1). Accordingly, we vacate the judgment of the district court dismissing the complaint, and we remand for the granting of appropriate relief not inconsistent with the foregoing.

## C. Liability and Damages Under § 605

█ In addition, since Cablevision's complaint requested damages under 47 U.S.C. § 605, there is a question as to whether Cablevision proved a violation of that section as well as of § 553. The question is material because, though as introduced in the 1984 Act, § 605(e)'s penalties were largely the same as those provided in § 553(c), § 605(e) was amended in 1988 to provide, as described below, far more severe penalties than those of § 553(c). Since the structure of § 605(e)'s provision for damages remains, in all pertinent respects, the same as the structure of § 553(c), we conclude that if Sykes's conduct violated § 605, Cablevision was entitled to damages under that section for the reasons discussed in Parts II.A. and B. above with respect to § 553. We think it unclear, however, whether § 605 was applicable.

Section 605(a) generally prohibits the unauthorized use or publication of wire or radio communications. To the extent pertinent here, it provides that

> [n]o person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). In addition, § 605(e)(4) makes it unlawful, in pertinent part, for any person to

> sell[ ] or distribute[ ] any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by subsection (a) of this section.

*Id.* § 605(e)(4) (as amended, *see* Pub.L. No. 100–667, § 205(12), 102 Stat. 3935, 3960 (1988)).

When a violation of § 605(a) or § 605(e)(4) has occurred, § 605(e)(3) grants a private right of action to an aggrieved person which parallels the right of action provided in § 553(c)(1) for a violation of § 553(a)(1). The principal substantive differences between the two enforcement schemes, for purposes of the present case, lie in (a) the minimum levels of statutory damages that must be awarded, and (b) the respective provisions for attorneys' fees (*see* Part II.D. below). Whereas for a violation of § 553(a)(1), the minimum damages awardable to an aggrieved person if the violator of that section was not aware and had no reason to believe that his acts constituted a violation is set at $100, the minimum damages awardable to an aggrieved person if the violator of § 605 was not aware and had no reason to believe that his acts constituted a violation of § 605 is set at $250, *see* 47 U.S.C. § 605(e)(3)(C)(iii). More importantly, whereas under § 553 the minimum statutory damages to be awarded against an aware violator is $250, under § 605 the minimum award against an aware violator is $1,000 for a violation of § 605(a) and $10,000 for a violation of § 605(e)(4), *see id.* § 605(e)(3)(C)(i)(II). Further, the minimum statutory award of $250 under § 553 is for "all violations involved in the action," *id.* § 553(c)(3)(A)(ii), whereas the minima of $1,000 and $10,000 for violations of § 605(a) and § 605(e)(4), respectively, are to be awarded for "each violation" of the pertinent subsection, *id.* § 605(e)(3)(C)(i)(II). *See also id.* § 553(c)(3)(A)(ii) (maximum statutory damages for all violations of § 553 set at $10,000); *id.* § 605(e)(3)(C)(i)(II) (maximum statutory damages for each violation of § 605(a) and § 605(e)(4) set at, respectively, $10,000 and $100,000).

In the present case, both the parties and the district court assumed that both § 553 and § 605(e) were applicable to Sykes's conduct. *Cf. Cablevision Systems Corp. v. Maxie's North Shore Deli Corp.,* No. 88–2834, 1991 WL 58350, at *1, 1991 U.S.Dist. LEXIS 4874, at *4 (E.D.N.Y. Mar. 20, 1991) (where plaintiff cable system operator owned the exclusive closed circuit and pay-per-view rights to televise a prizefight, and defendant operator of sports bar used satellite dish to "broadcast[ ] an unauthorized live feed" of the fight, plaintiff had its choice of remedies under § 553 or § 605). We question the assumption that both sections applied to the conduct of Sykes.

Both § 553 and § 605(e) were adopted as part of the 1984 Act. In that Act, except for specifying that the statutory damages award was for "all violations" of § 553 as contrasted with "each violation" of § 605, as mentioned above, the civil remedy provisions were substantially identical. The monetary levels provided under both sections were the same. If § 553 had been intended to reach only conduct that was also prohibited by § 605, Congress might well not have set out the civil enforcement mechanisms separately. Further, in 1988, Congress substantially increased the penalty levels provided by § 605(e), *see* Pub.L. No. 100–667, § 205(9), 102 Stat. 3935, 3959–60 (1988); thus, if § 605 reaches all conduct prohibited by § 553, it is improbable that an aggrieved person would ever seek damages under § 553 rather than § 605. Here, for example, Cablevision, claiming a violation of both § 553(a)(1) and § 605(e)(4), predictably requested statutory damages under § 605(e)(3)(C)(i)(II), under which, for a single aware violation, it would receive a minimum of $10,000 for Sykes's sale to Helsel, rather than the $250 it could be awarded under § 553.

Yet it is not clear that no overlap between §§ 553 and 605 was intended. The legislative history of the 1984 Act noted that the pre–1984 § 605 (renumbered § 605(a) by the 1984 Act), had a broad reach:

> Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies. For example, existing section 605 provides protection against the unauthorized reception of subscription television (STV), multipoint distribution services (MDS), and satellite communications.

130 Cong.Rec. 31,874 (Statement of Sen. Packwood), *reprinted in* 1984 USCCAN at 4746; *see also Ciminelli v. Cablevision*, 583 F.Supp. 158, 161 (E.D.N.Y.1984) (construing pre–1984 Act § 605 as reaching manufacture of descrambling devices for theft of cable services' wire transmissions). Senator Packwood stated that the 1984 amendments were not intended to make lawful any act already prohibited by § 605. *Id.* Similarly, the House Report stated:

> Existing section 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. Nothing in [proposed § 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service.

H.R.Rep. 934, at 83, *reprinted in* 1984 USCCAN at 4720.

The House Report proceeded, however, to describe the section that would eventually become § 553 as "set[ting] forth a liability provision specifically applicable to theft of *services offered over a cable system,*" H.R.Rep. 934, at 83, *reprinted in* 1984 USCCAN at 4720 (emphasis added), and explained that

> [t]he Committee intends the phrase "service offered over a cable system" to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under *section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*

*Id.* (emphasis added). This statement suggests an intent that § 605 was to govern theft of cable services not from the cable system's wiring but from an air-borne transmission prior to the wire transmission. Consistent with such an intent, the most pertinent portion of § 605(a) refers to "communication by radio"; and the most pertinent portion of § 605(e)(4) refers to the decryption of "satellite cable programming," a term defined as "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers," *id.* § 605(d)(1). No part of § 605 mentions decryption of signals transmitted by coaxial cable. *See also* H.R.Rep. No. 887, 100th Cong., 2d Sess. 14–15, 27–29 (1988) (noting need to amend § 605 to pro-

vide stiffer penalties for "piracy of satellite cable programming" than those provided by the 1984 Act, in order to deter persons who reap average profits of $1,000 or more per sale of unauthorized satellite dishes), *reprinted in* 1988 USCCAN 5611, 5642–44, 5657–58. Thus, it may be that Congress intended that to the extent that a device is sold to assist in the theft of signals directly from a satellite, § 605(e)(4) would apply; that if the theft is of signals transmitted by radio waves, § 605(a) would apply; and that when the theft is of a signal transmitted by coaxial cable, § 553(a)(1), and not § 605, would apply.

If this was Congress's intended scheme, it is hardly clear that Sykes's conduct violated § 605. As indicated in Part I above, Cablevision's distribution of cable programming involves several types and stages of communication, including receipt of signals from satellite, transmission via radio, and retransmission over coaxial cable wiring. From the instruction sheet that Sykes gave Helsel, which was introduced at trial, it appears that Sykes's box was designed only for intercepting cable wire transmissions, not for intercepting satellite or radio signals prior to their conversion to a form suitable for transmission over coaxial cable. Thus, it may be that only § 553, not § 605, was applicable to his conduct.

However, the applicability of § 605 to the present case was not explored below, apparently because both sides and the district court assumed that both that section and § 553 were applicable. The parties also have not briefed the issue in this Court. Since the case must in any event be remanded for the district court to award at least the relief provided by § 553(c), we leave it to that court in the first instance, if Cablevision wishes to pursue its claim under § 605, to determine the applicability of that section. If that section was violated and Cablevision was aggrieved thereby, the court should grant Cablevision's request for damages under § 605(e) instead of granting the lesser damages available under § 553.

### D. *Attorneys' Fees*

■ Finally, there is a difference between the provisions in § 553(c) and § 605(e) for the award of attorneys' fees. Section 553 provides that the court "*may* ... direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 553(c)(2)(C) (emphasis added). Though § 605, as amended by the 1984 Act, contained an identical provision, Congress further amended § 605 in 1988 to provide that the court "*shall* direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." Pub.L. No. 100–667, § 205(8), 102 Stat. 3935, 3959 (1988) (codified at 47 U.S.C. § 605(e)(3)(B)(iii)) (emphasis added). The award under § 605 is thus mandatory.

■ We do not believe, however, that such an award is mandatory under § 553. Though we concluded in Part II.B. above that notwithstanding § 553(c)(2)'s use of the verb "may" with respect to the award of damages, the court is required to award damages if an aggrieved person proves a violation, we do not reach the same conclusion with respect to attorneys' fees. The principal factor suggesting that an award of damages upon proof of a violation is mandatory is the presence of provisions for minimum levels of statutory damages. There are no similar provisions with respect to attorneys' fees.

Further, Congress apparently perceived a need to change "may" to "shall" in § 605(e)(3)(B)(iii), thereby indicating that it viewed the word "may" with respect to attorneys' fees as permissive. Given Congress's 1988 recognition that the large profits available from the sale of unauthorized devices for decoding satellite signals warranted an increase in the minimum statutory damages levels for aware violators to $1,000 and $10,000, it appears that the change in § 605(e)(3)(B)(iii) to provide that the court "shall" award attorneys' fees to a prevailing aggrieved party was designed to enhance those sanctions. Congress chose, however, not to make the same change in § 553(c)(2)(C), and we infer that it meant to leave any award of attorneys' fees under that section to the discretion of the court with respect to a defendant who, even as an aware

violator of § 553(a)(1), could still be penalized as little as $250.

Accordingly, if on remand Cablevision prevails on its § 605 claim, the court must award Cablevision reasonable attorneys' fees. If, instead, Cablevision proved only a violation of § 553, the court may, but is not required to, award such fees.

## CONCLUSION

We have considered all of Sykes's arguments in opposition to this appeal and have found them to be without merit. The judgment of the district court is vacated, and the matter is remanded for further proceedings not inconsistent with the foregoing.

Costs to Cablevision.