**IT IS FURTHER ORDERED** that this case is **DISMISSED** against defendant Angel Castro. Service has not been perfected on such defendant, but even had it been perfected, it would be dismissed for the same reasons that the Court has dismissed other named individual defendants.

**TIME WARNER CABLE OF NEW YORK CITY, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P.,**

v.

**CABLE BOX WHOLESALERS, INC. d/b/a C.B.W. Electronics and Gary and Jean Curran, husband and wife.**

No. CV 95–703 TUC JMR.

United States District Court,
D. Arizona.

March 29, 1996.

Daniel J. Lefkowitz and Patrick J. Sullivan, Jericho, NY, Maria Crimi Speth, Beus, Gilbert, & Morrill, Phoenix, AZ, for Plaintiff.

Richard M. Rollman, Lyle D. Aldridge, Tucson, AZ, for Defendants.

## ORDER

ROLL, District Judge.

## INTRODUCTION

Pending before the Court is plaintiff's motion for summary judgment on certain claims made pursuant to 47 U.S.C. § 553. For the reasons set forth below, plaintiff's motion for partial summary judgment is granted.

## FACTUAL BACKGROUND

### Time Warner Cable of New York City.

Plaintiff, TIME WARNER CABLE OF NEW YORK CITY ("Time Warner"), provides cable television programming in certain geographical areas, including Manhattan and Queens in New York City. Cable services provided include basic cable programming, premium programming, and Pay Per View. Time Warner scrambles all channels other than those on the basic service level. Basic service is provided for a set monthly fee, premium channels are available for additional monthly fees, and Pay Per View is sold by event, with fees ranging from $4 to $40.

Time Warner's signals are transmitted through cable wiring and equipment from the cable television transmission center (headend) to its customers' televisions. If a customer's television is not cable-ready, a converter is needed to modify the electronic signals carried through the cable into a format displayed as multiple TV channels. If a customer desires to access premium channels or Pay Per View, a decoder is necessary in addition to the converter. The converters/decoders Time Warner provides its customers are addressable, which means they can be remotely programmed by Time Warner from the headend to descramble specific premium channels or Pay Per View events the customer has ordered. Scrambling the signals of premium channels and Pay Per View and descrambling them with a decoder currently is the state-of-the-art technology utilized by cable companies to assure that only those services actually paid for are received by their customers.

### Cable Box Wholesalers.

Defendant CABLE BOX WHOLESALERS, INC. (Cable Box) is based in Tucson, Arizona. Defendant Gary Curran is the sole shareholder and managing officer of Cable Box. Defendant Jean Curran is Gary Curran's wife. Cable Box sold non-addressable decoders.[1] These decoders, which contained

---

1. On October 2, 1995, the Court granted Time Warner's application for a temporary restraining

specific chips and quickboards, were capable of intercepting cable signals of various cable companies depending upon the particular type of scrambling technology used and the signals to be decoded. Cable Box's decoders enabled subscribers of basic cable services to intercept premium channels as well as unlimited Pay Per View.[2] When Cable Box received a telephone order for a decoder, its employee would ascertain the name of the cable company servicing the area where the purchaser planned on using the decoder and the brand of equipment used by that cable company. Cable Box employees then matched the customer's order with equipment from its inventory. Cable Box believed that the merchandise it sold would descramble the cable signals of the particular cable company operating in the area where the customer intended to use the decoder.

Significantly, Cable Box did not market its equipment in Tucson, where the company is situated.

"Bullet busters" protect illegal decoders from cable company commands (bullets) which would otherwise detect and/or disable pirate decoders. Some decoders sold by Cable Box had built-in bullet busters, while others did not. Cable Box separately sold bullet busters to complement decoders without built-in bullet busters.

Defendants' catalog included a disclaimer, warning the purchaser that it is unlawful to intercept cable signals. The disclaimer informs the customer that the local cable company should be contacted for authorization prior to installing the decoder.[3] At the preliminary injunction hearing, Time Warner's Director of Signal Security testified that in the 5-½ years he has been involved in cable security, he has never received a call from a customer informing Time Warner that a customer purchased a decoder and wanted authorization for its use.

### Defendants sold decoders intended for use in plaintiff's franchise areas.

In August of 1995, Cable Box sold two decoders to Time Warner's investigator. The investigator represented to Cable Box employees that one decoder would be used in Manhattan and the other in Queens.

The first decoder sold by Cable Box to the investigator was manufactured by Pioneer. It was intended by defendants to descramble Time Warner's cable signals in Queens, but the decoder failed to do so.[4] Pursuant to Cable Box's guarantee, the investigator returned the Pioneer decoder to Cable Box and Cable Box sent another Pioneer decoder to the investigator. This decoder did descramble Time Warner's Queens cable signals.

Cable Box also sold the investigator a Jerrold decoder for use in Manhattan.[5] The

order, which was converted into a preliminary injunction on October 16, 1995. Pursuant to the injunction, Cable Box is no longer conducting its usual business of selling cable decoding devices and related equipment.

2. In one advertisement in *Popular Science* magazine, Cable Box stated: "You'll appreciate the premium view when you order from us!"

3. One Cable Box disclaimer states in part:

IMPORTANT

The purchase of products in this catalog does not authorize their use on any cable television system. The purchaser and/or user is obligated to notify their local cable television company and obtain specific authorization to use these products PRIOR to their installation. Cable Box Wholesalers, Inc. does not advocate unauthorized use of our products or theft of cable services.

4. In an August 31, 1995, tape recorded telephone conversation, the Time Warner investigator spoke with a Cable Box employee:

Employee: Cable Box Wholesalers, may I help you?

Investigator: Yes, I would like to make a purchase of a descrambler.

Employee: OK, do you know the make and model?

Investigator: Oh ... yes I want to buy a Pioneer for the Queens systems in New York.

Employee: ... I am out ..., but ... if you want to go on a back order I will have them ...

Investigator: OK, that is fine.

.    .    .    .    .

Investigator: OK and would that get all the channels?

Employee: Yeah.

Investigator: Pay Per View?

Employee: Yeah.

Unlimited Pay Per View is not an option offered by Time Warner in Queens or Manhattan.

5. During the same recorded telephone conversation, the following discussion occurred:

investigator tested the decoder sold by defendants and found that it descrambled Time Warner's premium and Pay Per View signals in Manhattan.

Time Warner's investigator paid $728.00 for these two decoders. Decoders have a projected useful life of seven to ten years. Thereafter, malfunctioning or obsolescence precludes continued use. Time Warner rents converter-decoder equipment to cable subscribers in New York City for $2.90 per month. This figure represents the actual cost of acquiring, maintaining and installing the equipment.

The evidence presented to the Court indicates that Cable Box has sold at least 198 decoders containing chips and quickboards equipped to intercept Time Warner's cable signals in Queens and Manhattan to customers living in or near these areas.

### 47 U.S.C. § 553

After Time Warner learned that Cable Box was selling decoders in Time Warner's franchise areas, it filed this lawsuit seeking monetary damages and injunctive relief, based upon 47 U.S.C. §§ 553 and 605. This motion for partial summary judgment involves only § 553(a). That statute provides in pertinent part:

§ 553. **Unauthorized reception of cable service**

(a) **Unauthorized interception or receipt or assistance in intercepting or receiving service; "assist in intercepting or receiving" defined**

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

> Investigator: ... I also wanted to purchase a second descrambler. A different one for a friend.
> Employee: OK.
> Investigator: Uh ... let me see, that would be uh ... oh its a Jerrold for Manhattan.
> Employee: That's a base band and there is no add on for that ...
>
> Investigator: And that would get all the channels also?

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

### Summary Judgment.

In ruling upon Time Warner's motion for summary judgment, the following issues must be resolved: (1) whether a reasonable fact-finder could disagree as to defendants' intent to assist in cable piracy; and, (2) whether the statute of limitations bars plaintiff's action.

Summary judgment should only be granted where the facts show that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure; *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). While some alleged factual disputes may exist, it is only genuine issues of material fact which preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). An issue is genuine, and summary judgment should not be granted, if the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party. 477 U.S. at 248, 106 S.Ct. at 2510. "All reasonable inferences must be drawn in the non-moving party's favor, but such inferences are limited to those upon which a reasonable jury might return a verdict." *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1220 (9th Cir.1995).

> Employee: Right.
> Investigator: Pay Per View?
> Employee: Yeah.
> The employee also discussed "bullet busters":
> Employee: So you're looking at 339, and 349 and 10 for the buster. [The Pioneer decoder for use in Queens] is already bullet proof.

### Intent

■ Cable Box argues that reasonable minds could disagree as to whether. Cable Box possessed the requisite intent to assist in the piracy of cable signals.

Defendants point to numerous publications which advertise decoders for sale. Defendants also emphasize that bullet busters, which Gary Curran referred to as "FM traps," are sold by many electronics stores.

Defendants place heavy reliance upon *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) and *Premier Communication Network, Inc. v. Fuentes,* 880 F.2d 1096 (9th Cir.1989). In *Sony,* two movie studios objected to Sony's manufacture of Betamax machines because they were capable of being used to infringe copyrights on the studios' films. *Sony* is inapplicable. In *California Satellite Systems v. Seimon,* 767 F.2d 1364, 1367 (9th Cir.1985), the Ninth Circuit stated that *Sony* "dealt with the interpretation of copyright law, not the Federal Communications Act." Furthermore, in *Sony* the Court held that the Betamax machines clearly could be used for substantial non-infringing uses. Similarly, *Premier Communication Network, Inc.* is not persuasive authority. There, issuance of an injunction requiring defendants to remove a microwave antenna which was used to intercept HBO programming in violation of 47 U.S.C. § 605 was held to be improper without a finding that defendants did not use their antenna for substantial legitimate purposes. Here, the decoders sold by Cable Box to purchasers in plaintiff's franchise areas had but one substantial purpose, that is, interception and descrambling of plaintiff's cable signals.

Defendants maintain that in other cases in which summary judgment was granted based upon violation of 47 U.S.C. § 553(a), the violator conceded that he or she acted with the intent to assist in cable piracy. Defendants argue that *Cable/Home Communications Corp. v. Network Productions, Inc.,* 902 F.2d 829 (11th Cir.1990), *Cablevision Systems Corp. v. Muneyyirci,* 876 F.Supp. 415 (E.D.N.Y.1994), and *Porter County Cable Co. v. Moyer,* 624 F.Supp. 1 (N.D.Ind.1983) illustrate this point. In *Cable/Home Communications,* the defendant said in an advertisement for his products that "no longer is it a requirement for you to pay for services that you feel are overpriced." 902 F.2d at 837. The defendant also stated that what he was doing was plainly illegal. *Id.* Similarly, in *Cablevision Systems,* the corporate defendant's sales representative and principal separately told an investigator posing as a purchaser that the decoder purchaser would never get caught. The sales representative stated that the decoders were sold in order to provide free cable. 876 F.Supp. at 418. Finally, in *Porter County Cable,* the defendant stated in an advertisement that his devices would pay for themselves in "cable savings" and the defendant testified at deposition that he clearly had the intent to assist his customers in intercepting cable signals. 624 F.Supp. at 2. Cable Box asserts that it has never conceded wrong-doing.[6] Cable Box argues that this Court cannot grant summary judgment because a material fact exists as to defendants' intent.

Time Warner points to several "badges of fraud" indicative of intent to commit cable piracy. These include Cable Box's distribution of brand-name decoders modified by the insertion of quickboards and chips resulting in wide-open decoders, defendants' employees' solicitation of information concerning the location where the decoder would be used and the make and model of decoder equipment used by the cable company whose signals were to be intercepted, the practice of guaranteeing that descrambling will take place, and the sale of equipment designed to defeat both addressability as well as cable company signals intended to incapacitate un-

---

**6.** Significantly, on October 4, 1995, the following telephone discussion took place between a Cable Box telephone salesperson and a Time Warner investigator:

Investigator: Ok, will that get all the cable channels?
Employee: You have access to everything.
Investigator: Even the Pay Per View?
Employee: Yeah ... legally I can't tell you that it descrambles Pay Per View.
Investigator: But most likely?
Employee: I heard it does.
Investigator: Ok, great, alright, thank you.

authorized decoders. As to this last matter, plaintiff points to the fact that some of defendants' decoders have built-in features which interrupt the data stream that detects and disables illegal converter boxes while bullet busters performing the same function are available as separate units to complement the decoders which do not have this built-in function.

Certain facts are beyond dispute. Cable Box sold signal decoders to the public. Before selling these decoders, Cable Box ascertained which cable company's signals would be intercepted and, if known, the brand of decoder used by the company. Cable Box guaranteed that the equipment would descramble cable company signals. Cable Box maintained records regarding various cable companies throughout the United States and abroad. Cable Box sent to each purchaser a decoder which, according to its records, was specifically equipped to descramble the signals of the cable system operating in the area designated by the purchaser. Because the two decoders sold by defendants to Time Warner's investigator cost $728.00, the rental cost charged by Time Warner for a decoder is $2.90 per month, and decoders only have a useful life of 7–10 years, defendants' argument that customers purchased Cable Box decoders to avoid rental fees on decoders is unpersuasive.[7]

Defendants also argue that its disclaimer disproves intent to assist in cable piracy. Repeatedly, however, disclaimers have been found to be no defense to claims under § 553(a). *See, e.g., United States v. Gardner*, 860 F.2d 1391, 1395 (7th Cir.1988) *cert. denied*, 490 U.S. 1023, 109 S.Ct. 1751, 104 L.Ed.2d 187 (1989); *ON/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir.1985); *Time Warner Cable of New York City v. Freedom Electronics*, 897 F.Supp. 1454, 1459 (S.D.Fla.1995); *Oceanic Cablevision v. M.D. Electronics, Inc.*, 771 F.Supp. 1019, 1025 (D.Neb.1991); *Subscription TV of Greater Washington v. Kaufmann*, 606 F.Supp. 1540, 1542 (D.D.C.1985).

Based upon all of the information concerning the defendants' sale of the 198 decoders in two franchise areas of Time Warner, no reasonable person could conclude that the defendants lacked the intent to assist in cable piracy.

### Statute of Limitations.

Defendants next argue that Time Warner's § 553(a) claims are barred by the statute of limitations. Both sides agree that a one year statute of limitation from the time the cause of action accrues applies to this action. A.R.S. § 12–541(3). Under federal law, a cause of action accrues once the plaintiff "knew or had reason to know of the injury that constitutes the basis of [the] action." *Dreher v. Amphitheater Unified School Dist.*, 22 F.3d 228, 232 (9th Cir.1994).

It is undisputed that the plaintiff did not have actual knowledge of damages caused by the defendants until August 1995. Defendants argue that the plaintiff should have been aware of Cable Box's conduct because of defendants' widespread magazine advertising of decoders for sale. This argument suggests that defendants' cable piracy activity was so open and notorious that what was taking place should have been obvious to plaintiff. Sale of decoders is not an uncommon occurrence. The decoders sold by the defendants, however, were modified to enable purchasers to intercept plaintiff's cable signals. There is no evidence that the plaintiff knew or should have known of this fact prior to August 1995. Only two months after plaintiff discovered what Cable Box was doing, it filed this lawsuit. The statute of limitations is no bar to the entry of summary judgment in favor of plaintiff.

### CONCLUSION

Plaintiff's motion for partial summary judgment concerning pertinent § 553(a) claims is granted. Remaining issues include defendants' alleged liability under § 605 and the amount of damages to be awarded pursuant to the entry of partial summary judgment concerning the § 553(a) claims.

---

**7.** Also unpersuasive are defendants' arguments that customers purchase their decoders to avoid potential liability to the cable company for lost, stolen or damaged equipment to restore such TV functions as remote volume control, picture-in-picture, or parental lockout.

## ORDER

For all of the reasons set forth above,

**IT IS ORDERED** that plaintiff's motion for partial summary judgment is **GRANTED** as to plaintiff's § 553(a) claims involving the 198 decoders sold by defendants to purchasers in Queens and Manhattan.