**INTERMEDIA PARTNERS SOUTHEAST, GENERAL PARTNERSHIP, Plaintiff,**

v.

**QB DISTRIBUTORS L.L.C. d/b/a QB Video, Darwyn Martin Bauer, Daniel Joshua Quade, John Does 1–10, Jane Does 1–10, Unidentified Corporations 1–10 and Unidentified Business Entities, Defendants.**

Civ. No. 98–830 (JRT/RLE).

United States District Court, D. Minnesota.

April 10, 1998.

---

**1276**

Daniel J. Lefkowitz, Wayne R. Louis, Jeriko, NY, C. Eric Hawes, Larkin Hoffman, Daly & Lindgren, Bloomington, MN, Alan L. Kildow, Kildow Law Office, Burnsville, MN, for Plaintiff.

Charles L. Hawkins, Hawkins Law Office, Minneapolis, MN, Anthony J. Siciliano, Siciliano Law Office, Springfield, MA, for Defendants.

## ORDER

TUNHEIM, District Judge.

Plaintiff Intermedia Partners Southeast, General Partnership ("Intermedia"), seeks a preliminary injunction pursuant to Fed. R.Civ.P. 65 and the Communications Act of 1934, as amended, 47 U.S.C. § 553(c)(2)(A) and § 605(e)(3)(B)(i) to stop the above-captioned defendants (collectively "defendants") from manufacturing and selling devices that cable subscribers can use to descramble programming services. The defendants oppose the motion and seek dissolution of the temporary restraining order now in effect. For the following reasons, plaintiff's motion is granted and defendants' motion is denied.

## FINDINGS OF FACT AND PROCEDURAL BACKGROUND

### A. Intermedia

Intermedia operates and maintains cable television systems in locations including the Nashville, Tennessee area. Intermedia offers cable television programming services to subscribers who request and pay for them.

Intermedia's programming is offered to its subscribers in "packages." "Basic" and "standard" tiers are packages of programming services which subscribers select and receive at a monthly rate. Subscribers can also purchase "premium" programming services for an additional monthly charge. Intermedia further offers "pay-per-view" programming, which allows subscribers to purchase individual programs such as a movie or sporting event for a per-event fee.

Intermedia provides each of its subscribers with a "converter" that is programmed ("addressed") by its central computer to convert the signals transmitted through the cable into different channels or services ordered by the subscriber. Like other cable operators, Intermedia "encodes" or "scrambles" its cable programming services to prevent subscribers from receiving programming services for which they have not paid. Subscribers purchasing scrambled programming services are provided with a "decoder" that is incorporated into the converter. The decoder unscrambles the specific services ordered by a subscriber, but leaves scrambled those services the subscriber has not purchased.

It is possible for a subscriber to install a converter-decoder unit or "descrambler" that is not authorized by Intermedia and descramble its programming services. Such a descrambler allows the subscriber to view all or part of Intermedia's services without paying for them.

### B. Intermedia's Investigation of Defendants

Brian Allen, a private investigator employed by ACI Investigations, Inc. ("ACI"),

submitted an affidavit and testified at the preliminary injunction hearing regarding his undercover investigation of defendants on behalf of Intermedia. In November 1997, Allen's company was retained by Intermedia to conduct an investigation into QB Video. Prior to that time, Intermedia and Allen had noticed advertisements for "QB Video" in a magazine called "Nuts & Volts."

Allen's initial corporate search of QB Video revealed that QB Distributors, L.L.C., doing business as QB Video, is incorporated in Minnesota and conducts its business from a location in Faribault, Minnesota. Defendants Darwyn Bauer and Daniel Quade are listed as the organizers of QB Video, and Bauer is listed as the firm's president.

Allen also conducted three undercover purchases of descramblers from QB Video during December 1997 and January and February 1998. He called QB Video's toll-free numbers and, posing as an Intermedia subscriber, ordered descramblers compatible with Intermedia's cable system. He testified that the person he spoke with at QB Video regarding the first sale indicated that QB Video had sold cable descramblers into Nashville, and that they had a descrambler (a "Boss unit") that would allow Allen to receive all of Intermedia's premium and pay-per-view channels. The person also told Allen that the device was not addressable.

Allen received three packages from QB Video containing descramblers, invoices, and instruction sheets, and made C.O.D. payments with money orders in the amounts set forth in the invoices. The descramblers subsequently were tested at Intermedia's Nashville facility, and they were found to be capable of descrambling all of Intermedia's premium and pay-per-view channels. Allen traced the money order used to pay for the first descrambler and found it had been deposited in a bank account held by Q.B. Distributors at Norwest Bank Minnesota South, N.A.

On January 14–15, 1998, Allen conducted surveillance at the business location of QB Video in Faribault, Minnesota. During his surveillance, he saw two men drive up and enter the premises and later confirmed that the vehicles were leased or registered to defendants Quade and Bauer. He also witnessed Federal Express and UPS trucks picking up and delivering packages at QB Video's address.

### C. Commencement of this Action

On February 25, 1998, Intermedia filed under seal the original complaint in this action alleging, *inter alia*, that defendants have engaged in the manufacture, modification, sale, and/or distribution of "pirate" cable television devices and equipment for the theft and unauthorized reception of Intermedia's cable programming services, in violation of 47 U.S.C. § 553 and § 605, and Tenn.Code Ann. § 7–59–109. In the complaint, Intermedia sought declaratory and injunctive relief and monetary damages.

On February 27, 1998, Intermedia moved the Court for an *ex parte* order to show cause, a temporary restraining order enjoining defendants from continuing to conduct their business in the manufacture, modification, sale, and/or distribution of alleged "pirate" devices, an asset freeze, an accounting, expedited discovery, and an order of seizure. Intermedia sought this relief *ex parte* because, it contended, defendants would be extremely likely to secrete or destroy the descrambling devices, records, and other evidence of their illegal pirate cable decoder business. The motion was based on Allen's affidavit outlining the undercover investigation of defendants, other affidavits, and a memorandum of law.

On March 6, 1998, the Court held an *ex parte* hearing on the matter. The Court issued a temporary restraining order ("TRO") on March 10, 1998, which the United States Marshal served on defendants. The TRO enjoined defendants from conducting their business in manufacturing, distributing, advertising, and selling "decoding devices";[1] enjoined defendants from altering, destroying, or removing books, records, and other evidence; restrained defendants from trans-

---

1. "Decoding devices" was defined in the order to include, but not be limited to, cable television decoders, converters (if modified so as to be capable of decoding scrambled cable transmissions or if connected to other decoding equip-

ferring, withdrawing, or removing their assets; directed defendants to identify all assets for plaintiffs; ordered defendants to identify all locations where decoding devices are stored; granted plaintiff expedited discovery including the immediate inspection of QB Video's place of business; and ordered defendants to show cause at a hearing (to be held the next day) why the TRO should not be confirmed and a preliminary injunction issued. Intermedia conducted its inspection immediately following service of the notice on defendants.

The Court held a hearing on March 11, 1998, at which Intermedia appeared through counsel and defendants appeared in person. Counsel for defendants submitted to the Court a letter requesting a short continuance due to his inability to travel to the hearing or to secure local counsel to appear on such short notice. The Court granted defendants' request for a continuance of the hearing on the preliminary injunction. Based on the representations of Intermedia's counsel and photographic and documentary evidence obtained in the inspection, however, the Court issued an order the same day granting plaintiff's motion for seizure from defendants' place of business all equipment reasonably believed to contain a decoding device and ordering the financial institutions in possession of defendants' funds and assets not to allow the transfer or withdrawal of these funds or assets.

## D. Preliminary Injunction Hearing

On March 17, 1998, the Court held a hearing on Intermedia's motion for a preliminary injunction. In addition to the arguments of counsel, Intermedia called two witnesses and presented physical and documentary evidence.

As set forth above, Allen testified regarding his undercover investigation of defendants and the three decoding devices he had purchased from them. Allen also testified as to what was discovered during the inspection of defendants' place of business and the types of decoding devices seized from the premises. In particular, Allen indicated that there were thousands of decoding devices— of various types—found on the premises. He described in detail the different types of decoding devices that were seized. He stated that these types of devices, when installed, cannot be detected by the cable operator. Additionally, he found evidence on QB Video's computer that they had sold over 12,500 of these devices since August 9, 1997, the date of the first computer entry.

Allen further testified regarding instructions he found for installation of one of these devices, known as the "T–One." At the top of the first page of these instructions is a warning which informs the purchasers that they should return the equipment to the dealer unless they agree to various terms and conditions. These terms and conditions include a declaration that the device will not be used to "intercept any cable television signal without proper authorization." Below this warning, under the heading "Cable Converter Testing Instructions," the instructions state: "Once the T–ONE is connected, powered up, and tuned, it will be possible to view all Pay–Per–View and premium services for cable box evaluation and testing." [2]

In addition, a number of invoices and pieces of customer correspondence were found on the premises, although none were more than one week old. Two invoices contain what appears to be handwritten customer notations.[3] One states "Please reship

---

ment), descramblers, descrambling cubes or "programmers," converter-decoder combination units, integrated circuits, quick boards, smart boards, test kits, chips, E proms, and circuit boards. For purposes of this Order, "decoding devices," "descramblers," and "descrambling devices" shall include any and all types of devices capable of descrambling or decoding cable television transmissions that were either shipped to Allen by defendants, seized from defendants pursuant to the Court's March 11, 1998 Order, or otherwise fall within a reasonable interpretation of the aforementioned definition in the Court's March 10, 1998 Order.

**2.** On the bottom side of the three decoding devices Allen purchased from QB Video there is a sticker which states as follows: "Purchase of this unit does not authorize the reception of pay TV signals. Permission to use this unit must be obtained from local cable company."

**3.** Defendants objected to these and other invoices as irrelevant because they did not involve sales to Intermedia's sales area. The Court denies this objection. The Court agrees that these documents do not tend to prove that QB Video actually made sales into Intermedia's territory.

ASAP" and "Does not descramble channels." Another states "Unit does not descramble premium channels ... As per our tel con please replace with Boss II." Also, a paper shredder, cash, various security tools,[4] cards setting forth cable-operator converter models and corresponding replacement descrambling units, a Federal Express computer, and UPS labels were found during the inspection.

Finally, Allen testified that during the inspection, a handwritten projected profit and loss statement prepared in August 1997 was discovered. The statement, which bears the initials "DWB," projects $2,000,000 in gross sales for one year, and a pre-tax, pre-payroll profit of $584,568.

Intermedia also called Stan H. Durey to testify. Durey is the director of security programs for General Instrument Corporation, a manufacturer of access control systems for cable and satellite television provider. His responsibilities include working with customers to develop security measures for preventing unauthorized access to cable television programming systems and providing expert assistance in investigating and prosecuting sellers of cable signal theft devices.

After describing how cable operators secure their services and the extent of theft of cable services, Durey explained in detail the four general types of cable decoding devices or "black box decoders" used to gain unauthorized access to cable programming. Durey then reviewed the various types of decoding devices seized from defendants. He opined that all of them are "theft" devices with only one purpose: unauthorized access to cable services. He testified that these devices subvert the security of cable operators because they are not addressable, and there is no way to determine whether a subscriber has installed such devices or is gaining unauthorized access to programming. Moreover, because these devices constantly

descramble all services, including pay-per-view programming, they "run absolutely counter" to the controlled, event-or service-specific descrambling cable providers utilize. Thus, no cable provider uses or authorizes the type of equipment defendants sell.[5] Finally, Durey stated that the various disclaimers placed on these devices are a blatant attempt to transfer the responsibility to the buyer, where it is clear that there is only intent in manufacturing these products is to allow unauthorized access to cable programming.

On cross-examination, Allen and Durey stated that, except for three sales to Allen, they have no knowledge of sales by QB Video into Intermedia's sales area. Likewise, Durey conceded that he does not know of, and could not know of, any unauthorized access to Intermedia's services using devices sold by QB Video. Finally, Durey stated that a cable subscriber could use these devices legally if he installed it, and, although all programming services would be descrambled, he only watched the services for which he had paid.

### E. The Parties' Arguments

Intermedia argues that this evidence establishes defendants' manufacture, sale, and distribution of the decoding devices are in clear violation of § 553 and § 605. It also contends the evidence is sufficient to support this Court's entry of a preliminary injunction. Intermedia asserts that the Court need not undertake the traditional balancing of equitable factors in determining whether to grant an injunction because both federal statutes provide for injunctive relief for violations of their provisions. In the alternative, Intermedia contends that an injunction is warranted even under the traditional balancing test.

Defendants do not dispute that they are in the business of manufacturing and selling

---

However, the Court finds these documents are relevant as evidence of defendants' knowledge and intent in conducting their business in the manufacture and sale of decoding devices.

4. Cable converter manufacturers use specialized screws to prevent others from gaining access to the inside of the box to make modifications. The manufacturers have corresponding "security tools" that allow them to open the boxes. Such tools typically are not available to the public.

5. Durey further opined that the intent of a recent Federal Communications Commission public notice on modified cable converter decoders was to clarify that any device which originally had been designed for use in an addressable system, but was subsequently modified so that it was no longer addressable, may not be sold lawfully in the United States.

various decoding devices. Rather, they argue they have violated no law and that Intermedia has not established the requisite elements for the issuance of a preliminary injunction. First, they point out that there is a circuit split on the issue of whether § 605 applies to unauthorized access to cable services. Second, they contend that Intermedia has failed to prove that they violated § 553 because there is no evidence of their specific intent to facilitate the unauthorized access to such services. Third, they assert that Intermedia's argument that the Court need not undertake the traditional balancing of equitable factors is unsupported in the case law. Finally, they contend that Intermedia has no standing and cannot establish irreparable harm because it offered no evidence of sales by QB video to subscribers in its territory or any theft of its cable services through the use of QB Video's products.

## ANALYSIS

### A. Section 553

Intermedia brings this action and claims it is entitled to an injunction under 47 U.S.C. § 553. Section 553(a)(1) expressly applies to cable systems, providing as follows:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

Section 553(a)(2) defines the prohibition against "assisting" in intercepting or receiving such communications:

> For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor of equipment (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

Any "person aggrieved" by a violation § 503(a)(1) may bring a civil action for temporary or final injunctive relief, damages, and costs including attorneys fees. *See* § 503(c). A court may award the following damages for violations of this section:

> (i) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

> (ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000, as the court considers just.

§ 553(c)(3)(A). If a court finds the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court has the discretion to increase the award of damages, whether actual or statutory, by an amount of $50,000. § 553(c)(3)(B).

Defendants do not dispute that § 553 prohibits the manufacture and sale of decoding devices with the specific intent that the device will be used for unauthorized interception of cable programming. Rather, they contend that Intermedia has failed to demonstrate that they are entitled to any relief under this section.

Most importantly, defendants argue that the manufacture and sale of decoding devices is not per se illegal and that Intermedia has failed to show that they acted with the specific intent to assist in the interception of cable programming. The Court agrees with defendants that manufacturing and selling decoding devices is not per se illegal. The plain language of the statute, which requires an intent to assist in unauthorized reception, and the fact that decoding technology obviously must be installed in cable systems to facilitate the *authorized* reception of cable services, rules out a finding that *any* manufacture or sale of such devices violates the law. *See, e.g., Continental Cablevision, Inc. v. Poll*, 124 F.3d 1044, 1047 (9th Cir.1997). To be in violation of § 553(a), defendants must have acted with the specific knowledge or intent that the decoding devices they manufactured and/or sold would

be used for the unauthorized interception of cable programming. *See, e.g., id; TKR Cable Co. v. Cable City Corp.,* No. 96–2877–(GEB), 1996 WL 465508, at *6 (D.N.J. July 29, 1996); *Time Warner Cable v. Freedom Electronics, Inc.,* 897 F.Supp. 1454, 1458 (S.D.Fla.1995).

■ Here, however, the Court finds that defendants' manufacture and sale of decoding devices is illegal under § 553(a). The evidence presented establishes that defendants acted with the requisite specific intent. The Court finds persuasive the uncontroverted testimony of Durey that the non-addressable decoding devices manufactured and sold by defendants have no legitimate purpose. Their sole purpose is to defeat the security measures of cable operators and allow the purchaser to gain (undetectable) unauthorized access to premium and pay-per-view services. The Court also notes that Intermedia presented evidence of customer returns and requested replacements when defendants' products failed to descramble channels (including premium channels). Moreover, defendants' instructions accompanying the "T–One" make clear that the device will allow the customer to view all pay-per-view and premium services.

This evidence, combined with defendants' destruction of their sales and customer records, is more than sufficient to support a finding that defendants specifically intended to assist their customers in the unauthorized reception of cable services and programs. The Court's finding of illegality is consistent with the conclusions of other courts in similar factual circumstances. *See, e.g., Poll,* 124 F.3d at 1047 (holding defendant had intent and knowledge that its decoding devices would be used for unlawful uses because the devices were non-addressable and were modified to descramble pay-per-view programming); *International Cablevision, Inc. v. Sykes,* 997 F.2d 998, 1003–04 (2d Cir.1993) (finding a violation of § 553 where defendant knew the nature and unlawful purpose of the decoding devices he sold and provided instructions as to how to connect the devices to descramble cable services); *Time Warner Cable v. Cable Box Wholesalers, Inc.,* 920 F.Supp. 1048, 1053 (D.Ariz.1996) (determining defendant had violated § 553(a) where it had ascertained which cable operator's sig-

nals were to be intercepted and sent purchasers decoding devices equipped to descramble that operator's signal); *TKR Cable Co.,* 1996 WL 465508, at *7–8 (holding the sale of undetectable decoding devices illegal where devices would defeat cable company security measures, seller represented purchaser could get all premium and pay-per-view channels, and replaced devices which they sold and were later returned because they did not descramble all cable programming); *Freedom Electronics,* 897 F.Supp. at 1459 (concluding defendants violated § 553 by manufacturing, selling, and distributing decoding devices having reason to know and intending that their devices would be used to intercept cable services and programming); *Cablevision Sys. Corp. v. Muneyyirci,* 876 F.Supp. 415, 419 (E.D.N.Y.1994) ("[Defendants'] failure to present any evidence of legitimacy, in the face of [plaintiff's] convincing presentation, including evidence that there is no legitimate retail market for the decoders and combination units, leads the Court to conclude that there is no genuine issue of fact with respect to the legitimacy of sales of single decoders or combination units to individuals.").

The Court rejects defendants' suggestion that because subscribers can use these devices legally—for example, by installing such a device and only viewing authorized channels—defendants cannot be found to have intended to assist in illegal cable pirating activities. Defendants have failed to offer any explanation for why a subscriber would purchase their products for such a legal purpose, when the cable operator supplies the equipment one needs for authorized access to premium and pay-per-view services. Given this reality, defendants cannot avoid a finding of specific knowledge and intent simply because Intermedia cannot prove particular subscribers actually used the devices illegally. *See, e.g., Poll,* 124 F.3d at 1048 ("The fact that Poll's boxes have legal uses does not insulate it from civil liability where the evidence establishes that Poll knew and intended the 'black boxes' to be used for unauthorized reception of cable television programming."); *Cable Box Wholesalers,* 920 F.Supp. at 1053 (rejecting a similar argument that customers may have purchased

defendants decoding devices to avoid the cable operator's minimal monthly rental fee).

■ Moreover, that defendants included warnings and disclaimers regarding illegal conduct with their decoding devices or instructions does not defeat a finding of specific knowledge or intent. Because, as set forth above, defendants know the one and only reason why their customers would purchase their products, the inclusion of a warning or disclaimer does not serve to exculpate them from their otherwise illegal conduct. *See, e.g., TKR Cable Co.,* 1996 WL 465508 at *7–*8; *Cable Box Wholesalers, Inc.,* 920 F.Supp. at 1053; *Freedom Electronics,* 897 F.Supp. at 1459; *Subscription Television v. Kaufmann,* 606 F.Supp. 1540, 1542–43 (D.D.C. 1985).

From this record, the conclusion that defendants are conducting their business with full knowledge and intent that their products will be used to gain unauthorized access to cable services is virtually inescapable. The Court finds defendants' conduct is illegal under § 553(a).

■ Defendants also suggest that even if their conduct violated subsection (a) of the statute, Intermedia is not a "person aggrieved" under § 553, and therefore cannot seek relief under subsection (c). Specifically, defendants argue Intermedia has not demonstrated that any subscriber to Intermedia's services has used devices sold by defendants to gain unauthorized access to its premium and pay-per-view services.

The Court finds such a theory unpersuasive. It is undisputed that defendants sold three decoding devices into Intermedia's area which are capable of descrambling Intermedia's services. Intermedia also offered uncontroverted testimony that Allen, in making these purchases, specifically requested devices that would work to descramble signals on Intermedia's cable system, and defendants accommodated this request. Thus, defendants illegally sold decoding devices to facilitate unauthorized access to Intermedia's cable services. Although a lack of evidence of unauthorized access ultimately may affect the amount of actual damages Intermedia can recover, the Court finds that these illegal sales are sufficient to give Intermedia stand-

ing as a "person aggrieved" under the statute.

## B. Section 605

Intermedia also brings this action and moves for a preliminary injunction pursuant to 47 U.S.C. § 605. Section 605(a) provides in relevant part:

> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

Like § 553, § 605 provides for injunctive relief and damages, although the statutory damages are greater than those in § 503. *See* § 605(e)(3)(B).

Unlike § 553, which expressly prohibits the unauthorized reception of services over a cable television system, § 605 prohibits the unauthorized reception of radio communications. The parties agree that the federal circuits are split on whether "radio communications" in § 605 includes the type of cable television transmissions at issue in this case. *Compare International Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir.) (concluding § 605 applies to programming transmitted over a cable system), *cert. denied,* —— U.S. ——, 117 S.Ct. 298, 136 L.Ed.2d 217 (1996), *with United States v. Norris,* 88 F.3d 462, 469 (7th Cir.1996) (finding § 605 does not apply to programming transmitted over a cable system).

To resolve the issues presently before it, the Court need not decide whether § 605 is applicable in this case. Because the Court already has found that defendants violated § 553, and because neither party argues that the standards for issuance of an injunction differ under these two provisions, the Court need not determine the reach of § 605. The Court notes that the applicability of this statute may affect ultimately the amount of damages available to Intermedia, but that question is not before the Court.

## C. Preliminary Injunctive Relief

The parties disagree over whether the Court needs to apply the Eighth Circuit's traditional balancing test in determining whether an injunction should issue. *See Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981) *("Dataphase")* (setting forth the traditional balancing test). Intermedia argues that because Congress expressly provided for injunctive relief in § 553(c), the Court may grant such relief upon the mere finding of a violation of the statute. Indeed, a number of courts outside the Eighth Circuit have held that when such express authority for issuance of an injunction is provided by Congress, an injunction may issue without resort to the traditional balancing of equitable factors. *See, e.g., TKR Cable,* 1996 WL 465508, at *10 ("When express authority for issuance of 'statutory' injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional 'equitable' prerequisites of such relief."); *Freedom Electronics,* 897 F.Supp. at 1460 (same).

In addition, the Eighth Circuit has recognized that the "traditional equitable standards are not to be considered once Congress has already balanced the equities and has determined that an injunction should issue when a defendant has engaged in any activity which a statute prohibits." *Burlington Northern R.R. v. Bair,* 957 F.2d 599, 601–02 (8th Cir.), *cert. denied,* 506 U.S. 821, 113 S.Ct. 69, 121 L.Ed.2d 36 (1992). In such a circumstance, the test is simply whether a plaintiff has demonstrated "reasonable cause" for the court to believe that a violation of the statute has occurred. *Id.* at 603. Given that the Court already has found that defendants are in violation of § 553, Intermedia clearly would be entitled to a preliminary injunction under this standard.

Defendants contend, however, that the Court should apply the *Dataphase* balancing factors because the Eighth Circuit has never recognized an exception for "statutory injunctions." Also, defendants discuss at great length why the reasoning in *Burlington Northern* is inapposite in this context.

The Court notes that the language of § 553(c)(2)(A)—which states a "court may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1)"—suggests that Congress intended that courts would apply a less rigorous standard akin to that Intermedia proposes. Nevertheless, the Court need not decide this question, because even if the tougher, equitable standard is applied, Intermedia is entitled to a preliminary injunction.

Under *Dataphase,* injunctive relief is appropriate if the movant demonstrates (1) a reasonable likelihood of success on the merits; (2) irreparable harm if preliminary relief is not granted; (3) the balance of hardships weighs in its favor; and (4) the public interest favors granting preliminary injunctive relief. 640 F.2d at 114. For the reasons set forth above, Intermedia clearly has demonstrated a likelihood of success on the merits. Intermedia also satisfies the other three prongs.

With respect to irreparable injury, the Court finds that Intermedia need only make a minimum showing of irreparable harm, because defendants clearly have violated § 553. *See, e.g., TKR Cable Co.,* 1996 WL 465508, at *10 (holding a plaintiff need not show the same quantum of irreparable harm where defendant has violated § 553 without justification); *Freedom Electronics,* 897 F.Supp. at 1460 ("Several federal courts have held that absence of justification for violation of clear statutory rights virtually eliminates the necessity of showing irreparable harm."); *Storer Communications, Inc. v. Mogel,* 625 F.Supp. 1194, 1202 (S.D.Fla.1985) (same). Intermedia has demonstrated such irreparable harm.

Because defendants have made sales of decoding devices into Intermedia's territory which are capable of descrambling Intermedia's services, because these devices, once sold, cannot be detected or traced by Intermedia, and because the Court finds defendants have a history of destroying all records relating to sales and customers, Intermedia will be irreparably harmed if defendants are allowed to continue their business operations. *Cf. Freedom Electronics,* 897 F.Supp. at 1460 ("[T]he plaintiff suffers irreparable harm from each converter-decoder device which

one of plaintiff's subscribers purchases from defendants."); *Kaufmann,* 606 F.Supp. at 1545 (finding in the context of satellite transmissions that plaintiff suffers irreparable harm each time a potential subscriber to its services is irretrievably lost because of the purchase of defendant's pirate decoder). Given that the market for and utilization of these devices is hidden, if defendants are allowed to continue manufacturing and selling these products, there is no way Intermedia can protect itself from subscribers using these products to pirate its services. Moreover, the continued illegal sale by defendants of these decoding devices into this underground market will harm Intermedia's goodwill and its interest in being the sole source of cable services in its service area. *See, e.g., Storer Communications,* 625 F.Supp. at 1202 ("Defendants' conduct causes irreparable injury because plaintiffs' ability to retain existing subscribers, to enlist new subscribers, to acquire suitable programming and remain in the cable business depends directly on their reputation as the sole source of the cable programming that plaintiffs provide."). Likewise, the continuing harm resulting from each violation and the difficulty in determining the damages suffered by Intermedia demonstrates that Intermedia lacks an adequate remedy at law. *See TKR Cable Co.,* 1996 WL 465508, at *11; *Freedom Electronics,* 897 F.Supp. at 1460.

In addition, the balance of hardships weighs decisively in Intermedia's favor since defendants will not suffer any hardship to any legitimate interest. Because defendants' manufacture and sale of decoding devices is illegal, any interest they have in continuing to conduct this business is not worthy of protection. *TKR Cable Co.,* 1996 WL 465508, at *11; *Storer Communications,* 625 F.Supp. at 1203. Defendants will suffer no harm if an injunction is issued which simply requires them not to violate the law. *See, e.g., Freedom Electronics,* 897 F.Supp. at 1460; *Storer Communications,* 625 F.Supp. at 1203. The Court further notes that the balance weighs in favor of an injunction enjoining defendants from all sales of decoding devices, not just a prohibition on sales into Intermedia's territory. Again, such an injunction will not prejudice any legitimate interest of defendants because all of their sales

of these devices violate § 553. A more limited injunction would not protect Intermedia because Intermedia would have no way to prevent or track the resale or subsequent distribution of these devices into its area.

Finally, the Court finds that the public interest will be served by the issuance of such an injunction. Halting defendants' manufacture and sale of decoding devices promotes the public interest by preventing further conduct Congress declared to be illegal in § 553. *See, e.g., TKR Cable Co.,* 1996 WL 465508, at *11 ("[N]umerous courts have noted the entry of an injunction against defendants' continued sale and distribution of unauthorized cable television decoding devices does not harm and, in fact, will promote the public interest."); *Freedom Electronics,* 897 F.Supp. at 1460 (finding such an injunction will promote the public interest). The Court rejects defendants' argument that allowing them to continue to manufacture and sell these decoding devices is consistent with Congress's desire to foster competition in the cable technology area. While defendants' references to the legislative history suggest Congress desired an open marketplace in certain types of cable technology, this history certainly does not support the conclusion that Congress wanted to foster competition through conduct it expressly declared to be illegal in § 553. *Cf. TKR Cable Co.,* 1996 WL 465508 at *5 ("Legislative history confirms that subsection 553(a)(2) was 'primarily aimed at preventing the manufacture and distribution of so called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service.' ") (quoting H.R.Rep. No. 934 98th Cong., 2d. Sess. 84 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4721). Defendants have offered no sound reason for why denying Intermedia's motion for an injunction would promote the public interest.

Thus, under the four-factor *Dataphase* analysis, the issuance of an injunction is appropriate in this case.

**D. Continuation of Asset Freeze and Seizure**

■ Part of the injunctive relief Intermedia seeks is a continuation of the asset freeze

and impoundment of defendants' decoding devices currently in effect under the Court's March 10, 1998 and March 11, 1998 orders. The Court finds Intermedia is entitled to a continuation of the asset freeze to preserve its statutory rights under § 553(c) to an accounting of the proceeds gained from defendants' illegal enterprise.[6] *See, e.g., TKR Cable Co.*, 1996 WL 465508, at *11; *Freedom Electronics*, 897 F.Supp. at 1460–61. This freeze will preserve the status quo and ensure that Intermedia can avail itself of its possible remedies. The freeze shall include both business and personal assets until a determination can be made as to the appropriate measure of damages and other relief and whether the personal assets are the product of defendants' illegal business.[7]

Defendants may submit a request for the release of funds to pay for personal expenses, including attorneys' fees, if defendants can demonstrate (in an affidavit or otherwise) a need for such funds. Also, defendants may withdraw funds upon written agreement of the parties.

The Court also concludes that the seizure and storage of the decoding devices should remain in effect as part of the injunction. The storage of these devices preserves them as evidence and in no way harms defendants since, under the preliminary injunction, defendants are enjoined from selling or otherwise distributing them. Any other decoding devices in defendants' possession, including those identified in defendants' storage locker on March 12, 1998, also shall be turned over for storage.

### ORDER

Based on the foregoing, the arguments of counsel, and all of the records, files, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Intermedia's motion for a preliminary injunction [Docket No. 3] is **GRANTED.**

2. Defendant's motion to dissolve the temporary restraining order [Docket No. 21] is **DENIED.**

3. The terms of the Court's March 10, 1998 and March 11, 1998 orders are **CONFIRMED** as set forth below.

4. Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them, are hereby enjoined and restrained from the sale,, transfer, advertisement and/or offer for sale, modification, manufacture, storage and distribution of cable television decoding devices (as defined herein) and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, modification, manufacture, storage or distribution of such equipment.

5. Defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them, acting on their behalf or acting in concert with them, are hereby restrained and enjoined from destroying, altering, removing or secreting any of the defendants' books and records, including but not limited to invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, insurance policies, shipping labels, or tax returns, including all records stored on computer discs or tapes within computer terminals or otherwise, which contain any information whatsoever concerning the business or finances of any of the defendants or otherwise reflect transactions of any kind involving decoding devices.

6. Defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them, acting . on their behalf or acting in concert with them, and any persons or other entities having joint ownership of assets with

---

6. The Court notes that Intermedia also may have similar rights under § 605, although at this time the Court declines to make any such determination or a determination as to the appropriate measure of damages under either statute.

7. Once discovery in this matter has been completed, defendants may move to have the asset freeze lifted to the extent they can establish as a matter of law that the maximum amount of damages and other monetary relief Intermedia can recover under any viable theory is less than the total dollar amount of the frozen assets. Full discovery, disclosure, and briefing by the parties is necessary before the Court can make any such determination. Defendants may move to expedite the discovery process if they can demonstrate delay would cause them undue hardship.

them, are hereby restrained from transferring, removing, encumbering or permitting the withdrawal of any assets or property, presently or formerly belonging to the defendants, jointly or severally, whether real or personal, tangible or intangible, including but not limited to cash, bank accounts of any kind, stock and bond accounts, and title to defendants' business property, except upon further order of this Court or written agreement of the parties.

7. The assets set forth in the Court's March 11, 1998 Order shall remain frozen, and the financial institutions set forth therein shall not permit the transfer or withdrawal of assets from the said accounts except as provided by previous or further order of this Court or by written agreement of the parties.

8. Defendants are under a continuing obligation to identify any other locations at which decoding devices are held, stored, manufactured, modified, received, shipped directly or indirectly by the defendants or their employees and agents, or persons acting on their behalf or in concert with them, or locations where their records are kept or from which telephone or other sales are made and shall also provide passwords to all computers which store information regarding sales, purchases, other business records, etc.

9. Further discovery in this matter shall be conducted pursuant to the times prescribed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Minnesota. The discovery granted hereunder may be accompanied by subpoenas issued pursuant to Fed.R.Civ.P. 45.

10. If defendants or any of their agents, employees or others controlled by them or acting on their behalf or in concert with them, obtain the possession or presently are in the possession, custody or control of any additional quantity of the above-described items (i.e., decoding devices, business records or proceeds from the sale of sold equipment), they will immediately notify the plaintiff or its attorneys, and retain without sale or other transfer such items or proceeds until further order of this Court.

11. Equipment seized from defendants and impounded pursuant to the Court's March 11, 1998 Order shall remain at a non-party storage warehouse pending further order of this Court. Any other decoding devices in defendants' possession, including those identified in defendants' storage locker on March 12, 1998, also shall be turned over for storage in the non-party warehouse.

12. The $50,000 bond posted by Intermedia with the Clerk of the Court pursuant to the Court's March 11, 1998 Order shall remain posted until further order of this Court.